IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
IN ADMIRALTY

|  |  |  |
|---|---|---|
| Carl Schroter GmbH & Co. KG, | ) | Civil Action No.: 2:20-cv-334-RMG |
|  | ) |  |
| Plaintiff, | ) | **DEFENDANT'S** |
|  | ) | **MEMORANDUM OF LAW** |
| vs. | ) | **IN SUPPORT OF** |
|  | ) | **MOTION TO VACATE** |
| Smooth Navigation S.A. | ) | **WARRANT OF ATTACHMENT OF** |
|  | ) | **VESSEL** |
| Defendant. | ) |  |
|  | ) |  |

Defendant Smooth Navigation, S.A. ("Defendant" or "Smooth") through the restricted appearance of its undersigned counsel Womble Bond Dickinson (US) LLP and Tisdale Law Offices, LLC pursuant to Supplemental Admiralty Rule E(8), respectfully submits this Motion to Vacate the Warrant of Attachment Pursuant to Admiralty Rule B issued by this Honorable Court on January 31, 2020 (ECF No. 9). Defendant is the owner of the M/V EVOLUTION ("Vessel"), which has been attached in the Port of Charleston since January 31, 2020. Smooth moves pursuant to Supplemental Admiralty Rule E(4)(f) for a prompt hearing at which Plaintiff Carl Schroter GmbH & Co. KG ("Plaintiff" or "Schroter") shall be required to show cause why the *ex parte* attachment of Plaintiff's Vessel should not be vacated. As will be demonstrated more fully herein and in the accompanying Declaration of Michail D. Kokkinis, President and Director of Smooth, Plaintiff does not have a *prima facie* maritime claim as required by Supplemental Admiralty Rule B. Further, equitable considerations warrant *vacatur* of the attachment.

## PRELIMINARY STATEMENT

An ex parte maritime attachment is an extraordinary equitable remedy which permits a claimant to restrain another party's property without notice.  However, when the attaching party comes to Court with unclean hands due to fraud and fails to advise the Court of the full circumstances underlying its claim, the attachment should not stand.

Plaintiff claims to be the "assignee of the maritime lien of Interfer-Steel and Commodities FZE" and its numerous foreign underwriters, "and therefore prosecutes this admiralty claim as the holder of Interfer-Steel and Commodities FZE's claim against defendants."  (Plaintiff's Verified Complaint, ECF No. 1 at ¶ 3).  However, the only connection to this cargo that  Interfer-Steel and Commodities FZE ("Interfer") can establish is based upon a fraudulent bill of lading.  Interfer has no standing to sue Defendants, and Interfer has no title to the cargo.  Rather, it is now clear that Interfer engaged in fraud with PT ISPAT INDO, the purported Indonesian purchaser of the cargo whose identity is also absent from the true bills of lading, and the intermediate Charterer of the vessel, Sandor Shipping OU ("Sandor") to issue fraudulent bills of lading.  And even if the fraudulent bill of lading were accepted as valid, Interfer would still have no title to the cargo, and as a mere assignee of same, neither does the Plaintiff.

Defendant agrees with Plaintiff that a maritime attachment under Supplemental Admiralty Rule B is designed to assist parties in obtaining security for their potential maritime claims. In its Complaint, Plaintiff asserts that it reserves its right to adjudicate its cargo damage claims in London arbitration.  There are two problems with this assertion: 1) Arbitration is a creature of contract, but the Defendant has no contract with the Plaintiff or its assignor and Defendant never agreed to arbitrate with Plaintiff, and 2) no arbitration proceeding has been commenced and there is no indication that Plaintiff intends on doing so.  Instead of seeking security for a pending or

impending arbitration or litigation, Plaintiff seeks to hold the Defendant's property hostage for some undisclosed period of time while threatening to pursue the claim in some unknown and inapplicable venue.

As to the Plaintiff's supposed torts claims, none are cognizable in law. First, the only claim of title to the goods and thus right to sue Interfer has is based upon a fraudulent bill of lading and even then, it had no title. Second, the shipper's own designated representative was always on board the Vessel and oversaw the care of the cargo, disposing of the bailment and negligence causes of action under any applicable law. Moreover, for reasons which escape Smooth, despite the fact that the carriage of Plaintiff's cargo from Iran occurred at a time when there were no US sanctions in place relating to this activity, Plaintiff's subrogor needed to conceal this fact and participated in a fraud for its own purposes.

Unlike a Fed. R. Civ. P. Rule 12(b)(6) motion, at a Rule E(4)(f) hearing, Plaintiff has the burden to prove that it has a prima facie maritime claim against Defendant as required by Supplemental Admiralty Rule B. Plaintiff has not alleged one, and the facts as set forth in this motion foreclose one. In addition, Defendant will shortly file a motion to assess *custodia legis* costs incurred during Plaintiff's attachment of its Vessel and to require the posting of security for future costs. In addition, the Defendant reserves the right to seek damages for wrongful attachment. As a result of the cargo's origin in Iran, Defendant's insurer is unable to post substitute security of any kind for the vessel. If the vessel is not released from attachment, Defendant's prompt demise is certain.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff commenced this action on January 30, 2020 with the filing of its Verified Complaint. (ECF No. 1). The Complaint alleges two tort claims: negligence (Cause of Action

One) and bailment (Cause of Action Two). Cause of Action Three requests attachment of the M/V EVOLUTION pursuant to Supplemental Admiralty Rule B. The Plaintiff's Complaint does not seek the arrest of the vessel pursuant to Supplemental Admiralty Rule C despite conflicting allegations in the Summons and Complaint that might be read to the contrary.

Plaintiff's Verified Complaint

Although the introductory paragraph of Plaintiff's Complaint refers to the M/V EVOLUTION as a Defendant *in rem* and the Summons seeks to effect service of process of the Complaint on the vessel instead of on Smooth, Plaintiff does not plead any facts which would support an *in rem* claim against the Vessel and does not include the Vessel in the caption or identify the Vessel *in rem* as one of the parties to the action. Furthermore, there is only a prayer for attachment pursuant to Admiralty Rule B, and no prayer for arrest pursuant to Admiralty Rule C (Verified Complaint, ECF 1, pg. 7, ¶ 2). Thus, the Vessel is not a party to this action but is instead the Defendant's property being attached to secure Plaintiff's *in personam* claim against the Defendant.

The following facts are allegations from Plaintiff's Verified Complaint which Defendant reserves the right to address in accordance with the Federal Rules of Civil Procedure. Defendant denies nearly all the facts in the Verified Complaint, denies responsibility for the alleged cargo damage, and is not liable to Plaintiff under any theory.

Notably, Plaintiff is alleged to be the assignee, rather than an actual party, to the claims stemming from these transactions. (*Id*. at ¶ 3). Plaintiff alleges that its assignor/subrogor Interfer purchased 15,095.638 metric tons of direct reduced iron ("DRI") from CGT Middle East, LLC which Interfer is alleged to have sold to PT Ispat Indo for delivery to a port in Indonesia. (*Id*. at ¶ 6). It is further alleged that Smooth chartered the M/V EVOLUTION to non-party Sandor

Shipping OU ("Sandor") and that Interfer contracted with Sandor to ship the cargo from Iran to Indonesia. (*Id.* at ¶ 8-10). In reality, unbeknownst to Defendant, Interfer sub-chartered the Vessel from Sandor. Neither the Verified Complaint nor its attachments contain any evidence or even allegations that Interfer entered into any contract or agreement with Defendant Smooth. Paragraphs 12 through 18 of the Verified Complaint purport to detail a cargo damage claim, all of which Defendant disputes, and are not relevant to this Motion to Vacate.

The First Cause of Action purports to assert a negligence claim but does detail how Defendant Smooth owed a duty to a party with whom it had no privity and who was not a party to the bills of lading. Plaintiff also fails to disclose what legal regime it contends governs the action. (*Id.* at ¶ 4-5, 19-21). The Second Cause of Action, for Bailment, incorporates previous allegations but does not allege the element of exclusive control required to state a claim for bailment under maritime law. (*Id.* at ¶ 22-25). Exclusive control, in fact, did not exist at any time during the Defendant's carriage of the cargo. The Third Cause of Action requesting a maritime attachment under Rule B correctly alleges that Smooth is a non-resident with no offices in the State of South Carolina and that Smooth owns the M/V EVOLUTION. (*Id.* at ¶ 27, 28). As discussed later herein, a critical element to a Rule B attachment is the averment of a cause of action cognizable in maritime law, yet none is included in this Complaint.

Paragraph 33 alleges that Plaintiff's claim against Defendant is subject to arbitration in London, England and that Plaintiff "reserves its right to proceed with arbitrating the merits of its claims with the Defendant." (*Id.* at ¶ 33). Remarkably, Plaintiff does not allege that Interfer was signatory to any contract with Defendant, let alone one which requires arbitration of disputes between them. No contract is alleged because none exists. Nor does Plaintiff allege that it has commenced arbitration in London or even that it intends to do so at some point in the future.

The Head Charter Party Between Defendant and Sandor

Defendant Smooth and non-party Sandor entered a charter party dated June 15, 2018 by which Smooth agreed to charter the M/V EVOLUTION to Sandor.  (Hereinafter referred to as "head charter party") (Kokkinis Decl. ¶ 4, Exhibit 1).  The head charter party consists of a fixture recap which incorporated a New York Produce Exchange Time Charter which is governed by English law.  The charter places the responsibility for loading and stowing the cargo on Sandor, not on the Defendant.  The head charter party was for a one-time charter trip always trading via safe passages and carrying "direct reduced iron" or DRI-B in bulk from Iran to a port of discharge to be designated within the Singapore-Japan range. (*Id.*).  It further provided that the shippers are to appoint a specialized supercargo[1] who will sail with the vessel at all times until the completion of discharge.  (*Id.* at pg. 10 of 19).  Sandor was responsible for placing adequate piping in the cargo holds and to seal the cargo holds under advice of the supercargo and master's direction and supervision.  (*Id.* at pg. 11 of 19).

The head charter party further provides that all bills of lading will strictly conform to the mate's receipts, even if the Charterer, Sandor, issues them.  (*Id.* at pg. 13 of 19).  Prior to issuance of any bills of lading, Sandor was to provide a draft copy to Smooth for its approval.  (*Id.*).  Only after Smooth provided written approval was Sandor authorized to issue the original bill of lading. (*Id.*).  Finally, the charter party provided that the port of loading in Iran must be clearly mentioned on the mate's receipts, cargo manifests, and the bills of lading "under all circumstances." (*Id.* at pg. 14 of 19).

---

[1] In this context, a "supercargo" is a personal representative of the cargo shipper who sails aboard the ship to monitor the stowage and condition of the cargo for the duration of the subject voyage.

The True Bills of Lading

As mentioned above, the head charter party between Smooth and Sandor provides that all bills of lading are to be in strict conformity with the mate's receipts and that, if loading is to occur in Iran, that the Iran port of loading is to be clearly mentioned on the bills of lading under all circumstances. (Kokkinis Decl. ¶ 10).

Upon the completion of loading at Bandar Abbas, Iran, on June 28, 2018, three bills of lading were issued with Smooth's consent by the Charterers' local agent on behalf of the Master. (Kokkinis Decl., ¶ 5, Exhibit 2). Each bill of lading identified a different shipper: Dubral Industries, Pars Diba, of Tehran, Iran; Banyan Co. of Tehran, Iran; and the Pension Fund Trading Company. The bills of lading were all non-negotiable and consigned to CGT Middle East, Dubai, UAE. Each bill of lading identified Bandar Abbas, Iran as the port of loading and Surabaya, Indonesia as the port of discharge.

The Sub-Charter Party Between Sandor and the Plaintiff's Alleged Assignor, Interfer

Under the head charter party, Sandor had the right to sub-charter the vessel with "Charterers' remaining responsible for the fulfillment of this Charter Party." (Kokkinis Decl., ¶ 4, Exhibit 1). Almost one year after the discharge of the subject cargo in Indonesia, Plaintiff presented a $1.5 million claim for cargo damage to Smooth and provided Smooth for the first time with a copy of the sub-charter between Sandor and newcomer Interfer, as well as a different and previously undisclosed bill of lading. (Kokkinis Decl., ¶ 8). The sub-charter party between Sandor and Interfer consists of a GENCON 1994 Uniform General Charter form and Additional Clauses dated May 5, 2018. (Exhibit 4 to Declaration of Kokkinis). The charter party provides for the carriage of minimum 15,000 metric tons bulk DRI from Bandar Abbas to Surabaya. The cargo was to be loaded, stowed, and secured by the charterers (Interfer) free of any risk or liability to the

owners (Sandor).  (*Id.* at ¶ 5(a)).  Unlike the head charter, Clause 26 of the sub-charter permits bills of lading to be issued which do not conform to the mate's receipts.  (*Id.* at ¶ 26).  Clause 26 of the sub-charter then provides, "[c]harterers have the option that loading port in Bs/l will show as 'Jebel Ali' against LOI."  (*Id.*)  This sentence permits fraudulent bills of lading to be issued, specifically authorizing the Port of Loading to be falsified to the free port of Jebel Ali, Dubai, rather than the diplomatically more problematic Port of Bandar Abbas, in Iran.  Defendant was unaware of this provision and had no involvement in its drafting or operation.

The sub-charter also permitted a supercargo to monitor the cargo while on board the Vessel.  (*Id.* at ¶ 36).  As noted *supra*, the supercargo attended on board the Vessel and monitored the cargo on a daily basis throughout loading, the ocean voyage, and through the completion of discharge.

The Fraudulent Bill of Lading

As with the secret sub-charter, until receipt of this claim, Smooth was equally unaware that another (fraudulent) bill of lading, other than the true bill of lading authorized by the Master, was issued for this cargo.  Instead of the non-negotiable bills of lading which Smooth authorized, this unauthorized bill of lading was negotiable and entirely different.  Instead of the three shippers identified above, the shipper was identified as Interfer.[2]  Instead of being non-negotiable and consigned directly to CGT Middle East, the unauthorized bill of lading was consigned "To Order," making it a negotiable document.  And instead of identifying the load port as Bandar Abbas, Iran, the port of loading was mis-identified as Jebel Ali, Dubai, UAE.  This bill of lading did not conform to the Mate's Receipts and was not authorized, approved, or signed by the vessel's Master.

As the sub-charterer and shipper on the fraudulent bill of lading, whether as a matter of contract or tort, Interfer had no privity of contract with Defendant Vessel Owners, and therefore

---

[2] That is, the shippers Dubral Industries, Pars Diba, of Tehran, Iran; Banyan Co. of Tehran, Iran; and the Pension Fund Trading Company.

Vessel Owners never owed any duty of care to Interfer under any legal regime. So egregious is the issuance of a fraudulent bill of lading that, when a U.S. port is involved, it is a criminal act to issue one, potentially subjecting the responsible party to imprisonment for up to five years. *See* 49 U.S.C. § 80116.

Interfer's alleged sale to PT Ispat Indo

According to Plaintiff's Complaint, "Interfer…sold the 15,095.638 metric tons of Direct Reduced Iron (Type B) to PT Ispat Indo and agreed to deliver [it]…to the port of Surabaya, Indonesia." (Verified Complaint at ¶ 7). According to the claim documents presented by Plaintiff, the cargo was sold to PT Ispat Indo on a CIF basis. (Kokkinis Decl., ¶ 16). Even if the bill of lading was not fraudulent, under Interfer's terms of sale, title to the goods passed to the Buyer, PT Ispat Indo immediately upon loading. Accordingly, Interfer had no title to the cargo in question, and thus neither Interfer nor its assignee, the Plaintiff, has title to sue the Defendant.

Why is the true title holder, PT Ispat Indo, not bringing this claim? Why is Plaintiff not assigned the rights of PT Ispat Indo? PT Ispat Indo is a very substantial steel producing company in Indonesia. (*See generally* www.ispatindo.com) which is part of Arcelor Mittal, a major international steel-producing company with offices around the world, including in the United States. Although the loading of the cargo in Iran was not then subject to U.S. sanctions when carried and delivered in Indonesia, either to avoid scrutiny in the United States or Customs' regulations or fees in Indonesia, Interfer issued the fraudulent bill of lading by eliminating any reference to Iran. Whatever Interfer's motivation to issue the fraudulent bill of lading, this scheme cannot be rewarded. As a result of its assignor's having issued the fraudulent bill of lading, the Plaintiff has come into Court with unclean hands even as it seeks one of the most extraordinary of equitable remedies, the *ex parte* attachment of the Vessel.

The Charleston Attachment

On January 31, 2020, the United States Marshal for the District of South Carolina served the Writ of Attachment on the Defendant's Vessel, which has been restrained since that time. Every day the Vessel remains under attachment in Charleston, Smooth suffers significant monetary and reputational harm. (Kokkinis Decl. ¶ 20). There is no possibility of substitute security in this case because the Vessel's insurer cannot issue such substitute security. Moreover, Smooth Navigation is itself unable to post security in lieu of the Vessel. (Kokkinis Decl. ¶ 19). Thus, if the attachment is not vacated promptly and the Vessel remains under attachment, Smooth will fold. (Kokkinis Decl. ¶ 21).

Pursuant to Supplemental Admiralty Rule E(4)(f), Defendant respectfully requests that the Plaintiff be required to show cause why the attachment should not be vacated. Defendant respectfully requests a hearing on an urgent basis pursuant to Supplemental Admiralty Rule E(4)(f).

## LEGAL STANDARD

"Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted." *Dry Handy Investments, Ltd. v. Corvina Shipping Co. S.A.,* 988 F. Supp. 2d 579, 581–82 (E.D. Va. 2013) (citing Fed. R. Civ. P. Adm. Supp. R. E(4)(f)).

After receiving notice of Supplemental Rule B attachment, the defendant is entitled to contest the attachment at a prompt hearing pursuant to Rule E(4)(f). *Vitol, S.A. v. Primerose Shipping Co.,* 708 F.3d 527, 541 (4th Cir. 2013). To avoid *vacatur* of attachment, it is the plaintiff's burden to show that "1) it has a valid prima facie admiralty claim against the defendant; 2) the

defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." *Id.* (citing *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,* 460 F.3d 434, 445 (2d Cir. 2006)).

If the plaintiff "fails to sustain his burden of showing that he has satisfied the requirements of Rule B and E," the attachment must be vacated. *Aqua Stoli,* 460 F.3d at 445; *Dry Handy Investments, Ltd.,* 988 F. Supp. 2d at 581–82.

## ARGUMENT

### I.    Plaintiff cannot satisfy requirements of Supplemental Admiralty Rule B

Supplemental Rule B provides in pertinent part:

> If a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process.

*Fed. R. Civ. P. Adm. Supp. R.* B(1)(a).

Rule B provides for *quasi in rem* jurisdiction; that is, where a defendant cannot be served in the forum district, he may nevertheless be subject to the Court's authority if he owns personal property located within the forum district. *Woodlands Ltd. v. Nationsbank, N.A.*, 164 F.3d 628, No. 97-1813, 1998 WL 682156, at *4 (4th Cir. 1998) ("In a Rule B attachment case, jurisdiction is derived from the attachment of the property of the defendant. A Rule B attachment case is, therefore, a *quasi in rem* action instituted for the purpose of (1) asserting jurisdiction over the defendant in personam through the property and (2) to assure satisfaction of any judgment.").

Accordingly, for a maritime attachment to issue, the following conditions must be met: (1) that the party seeking to effect attachment has a prima facie valid admiralty claim, (2) defendant cannot be located within the district, (3) defendant owns tangible or intangible personal property

11

located within the district, (4) there is no statutory or maritime bar to the attachment. (citing *Vitol, S.A. v. Primerose Shipping, Co.,* 708 F.3d 527, 541 (4th Cir. 2013); *Aqua Stoli Shipping Ltd.,* 460 F.3d at 445, *abrogated on other grounds by Shipping Corp. of India Ltd. v. Jalhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009); *Evridiki Navigation. Inc. v. Sanko S.S. Co. Ltd*., 880 F. Supp. 2d 666 (D. Md. 2012); THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 21:3 (6th ed. November 2019 Update).

In order to obtain an attachment, the plaintiff must plead legally sufficient facts to support a conclusion that it is entitled to an attachment. *DS-Rendite Fonds Nr. 108 VLCC Ashna GmbH & Co. Tankschiff KG v. Essar Capital Ams. Inc*., 882 F.3d 44, 50 (2d Cir. 2018), *Peninsula Petroleum Ltd. v. New Econ. Line Pte Ltd*., No. 09 CIV. 1375 (PGG), 2009 WL 702840, at *2  (S.D.N.Y. March 17, 2009).

If the Court orders attachment, then "any person claiming an interest in [the property] shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated." *Fed. R. Civ. P. Supp*. R. E(4)(f). These procedures allow maritime plaintiffs to assert claims against a defendant "over whom the court does not (otherwise) have personal jurisdiction, by seizing property of the defendant (alleged to be in the hands of a third party)." *DS-Rendite Fonds Nr. 108 VLCC Ashna GmbH & Co. Tankschiff KG*, 882 F.3d at 47; *Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V*., 249 F.3d 413, 421 (5th Cir. 2001). Any plaintiff seeking an initial *ex parte* order of attachment or garnishment bears the burden of establishing the right to attachment. *Icon Amazing, LLC v. Amazing Shipping, Ltd*., 951 F. Supp. 2d                                   909,                                   915                                   (S.D.Tex.2013) (citing *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty Ltd*., 460 F.3d 434, 445 (2d Cir. 2006)); *DS-Rendite Fonds Nr. 108 VLCC Ashna GmbH & Co. Tankschiff KG*, 882 F.3d at 48. Ultimately,

the decision to grant or deny a motion for order of attachment rests in the trial court's discretion. See *DS-Rendite Fonds Nr. 108 VLCC Ashna GmbH & Co. Tankschiff KG*, 882 F.3d at 48, 51; see also *E.N. Bisso & Son, Inc. v. Bouchard Transportation Co., Inc*., No. CV SAG-19-3629, 2019 WL 7185555, at *1 (D. Md. Dec. 26, 2019).

When a party brings a motion to vacate a maritime attachment under Rule E, "the plaintiff must demonstrate that 'reasonable grounds' exist for the attachment…. This involves review not only of the adequacy of the allegations in the complaint, but also any evidence submitted by the parties." *Emeraldian Ltd. P'Ship v. Wellmix Shipping Ltd.*, No. 08 CIV 2991 (RJH) 2009 WL 3076094, at *3 (S.D.N.Y. Sept. 28, 2009), citing *Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd*., 475 F. Supp. 2d 275, 278 (S.D.N.Y. 2006).

In this case, Plaintiff lacks a *prima facie* maritime claim and has failed to advise the Court of the underlying proceedings in which it intends to adjudicate the merits of its purported dispute with Defendant.  As such, the *ex parte* attachment should be vacated.

## II.    Interfer's only connection to the Defendant and this cargo is the fraudulent bill of lading.  This attachment must be vacated.

It is indisputable that the Plaintiff's assignor was party to a conspiracy to issue a fraudulent bill of lading concerning the cargo in dispute.  This bill of lading is the only document establishing Interfer's connection to this cargo.  It is universally accepted that courts in the United States will not render aide to a party to a fraudulent bill of lading.

> A bill of lading is a document of dignity and courts should do everything in their power to preserve its integrity in international trade for there, especially, confidence is of the essence.

*The CARSO,* 43 F.2d 736, 744 (D.N.Y. 1930); *aff'd in part, rev'd in part on other grounds.* 53 F.2d 374 (2d Cir. 1931).

It is axiomatic that a party may not benefit from its own fraudulent conduct. "The doctrine of *in pari delicto* prevents a party from suing others for a wrong in which the party itself participated. A court 'will not aid a fraudfeasor who invokes the court's jurisdiction' to relieve it of the consequences of its fraud." *In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 713 (S.D.N.Y. 2006) (internal quotation omitted); *see Hunter v. Wheate*, 289 F. 604, 606 (D.C. Cir. 1923) (stating that the "support of this proposition are numerous"); *Levy v. Kansas City, Kan.*, 168 F. 524, 525 (8th Cir. 1909); *see also Trustees of Aftra Health Fund v. Biondi*, No. 99 C 1286, 2000 WL 1129988, at *2 (N.D. Ill. Aug. 9, 2000), *aff'd*, 303 F.3d 765 (7th Cir. 2002) (there is "[a] long and unbroken series of precedents [that] establishes the rule that courts will not aid a fraudfeasor who invokes the court's jurisdiction to profit from his own fraud by recovering damages.") (internal citation omitted).

This principle has not lost its traction in more recent times. "Undoubtedly, one of the most fundamental maxims underpinning law is that one ought not be permitted to profit from their own wrongs." *Snyder v. PNC Bank, NA*, No. 3:12-CV-000002, 2013 WL 1089877, at *4 (E.D. Tenn. Mar. 15, 2013). "No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own inequity." *Id.* (internal quotation omitted). The Court in *Snyder* details in length the prevalence of this principle not only in U.S. jurisprudence but as "universal law administered in all civilized countries." *Id.* (internal quotation omitted).

## III.    Even under its fraudulent bill of lading Interfer has no standing to sue Defendant.

Even if we ignore the un-ignorable and assume the fraudulent bill of lading was not fraudulent, Interfer and the Plaintiff, its subrogee, have no title to sue.

14

Under a CIF contract, title and risk often passes to the Buyer upon loading onto the vessel. International Chambers of Commerce ("ICC"), *Incoterms 2010,* available at https://iccwbo.org/resources-for-business/incoterms-rules/incoterms-rules-2010/, (last visited on February 19, 2020, 1:22PM); *see also In re World Imports,* 516 B.R. 296, 302 (Bankr. E.D. Pa. 2014) (same, discussing change from 2000 version).

The same is true under English law, the law incorporated in Smooth's head charter party. Under the CIF contract, property and risk transfers to the buyers of the cargo upon delivery of the documents against which payment is made. In *The Julia,* Lord Simmonds said that it was a *"salient characteristic of a c.i.f., contract that the property not only may but must pass by delivery of the documents against which payment is made."* [1949] A.C. 293 at 317. The commercial invoice issued by Interfer states that *"the payable amount"* must be *"received at Seller's account latest 3 (three) days after receipt of copy of Bill of Lading and invoice by email."* *Id.* The commercial invoice is dated 28.06.2018 which is the date of the bill of lading. The vessel arrived at Surabaya on 17 July *i.e.* 20 days later.

Where a plaintiff is neither a signatory to the contract of carriage nor the title holder of the goods at the time of the loss, that plaintiff lacks title to sue. *United States v. Central Gulf Lines, Inc.,* 699 F.2d 243, 245 (5th Cir. 1983). "Any suit for recovery of the value of the missing [cargo] would have to be grounded upon a breach of the contract of carriage, to which the United States is not a signatory." *Id.*

Because Interfer was neither in contractual privity with Defendant nor the title holder of the cargo at the time of the loss, Plaintiff, as assignee of Interfer, had no title to sue. The attachment should be vacated.

**IV.    Defendant is under no obligation to arbitrate the merits of this dispute with Plaintiff because it is not party to any agreement, much less to an enforceable arbitration agreement, with Plaintiff.**

It is well settled law that since arbitration is a creature of contract, a non-signatory to the arbitration clause cannot be bound to arbitrate. *See e.g. Nolde Bros. v. Local No. 358, Bakery & Confectionery Workers Union, AFL-CIO*, 430 U.S. 243, 250 (1977)(citing *Steelworkers v. Warrior & Gulf Nav. Co*., 363 U.S. 574, 582 (1960); e.g., *Gateway Coal Co. v. Mine Workers*, 414 U.S. 368, 374 (1974); *John Wiley & Sons v. Livingston, supra*, 376 U.S. 543, 547 (1964); *Atkinson v. Sinclair Refining Co*., 370 U.S. 238, 241 (1962)); *Marrowbone Dev. Co. v. Dist. 17, United Mine Workers of Am*., 147 F.3d 296, 300 (4th Cir. 1998).

Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. *East Coast Hockey League, Inc. v. Professional Hockey Players Ass'n*, 322 F.3d 311, 314 (4th Cir. 2003) (quoting *AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648 (1986) (internal quotation marks omitted)). In situations that involve a charter party or bills of lading, a court may compel arbitration only when the dispute arises under a contract that includes or incorporates an arbitration clause. *See, e.g., Barna Conshipping, S.L. v. 2000 Metric Tons, More or Less, of Abandoned Steel*, No. 2:08CV612, 2011 WL 13195916, at *2 (E.D. Va. Apr. 29, 2011); (citing *F.D. Import & Export Corp. v. M/V REEFER SUN*, 248 F. Supp.2d 240, 250 (S.D.N.Y. 2002) ("Plaintiff's claims related to the planting and maintenance of the fruit are not within the scope of the arbitration clause because they do not touch matters covered under the Charter Party or Bills of Lading.")).  Here, there is no contract or bill of lading to which both Plaintiff and Defendant are parties.  As such, London arbitration cannot be the forum which will decide the merits of the underlying dispute for which Plaintiff seeks security.

In a situation very similar to the instant case, a district court in the Second Circuit held that a vessel owner could not be bound by an arbitration clause contained in a sub-charter of the vessel. *BS Sun Shipping Monrovia v. Citgo Petroleum Corp*., 509 F. Supp. 2d 334, 346–47 (S.D.N.Y. 2007). The *BS Sun* Court cited a prior decision where Judge Mukasey noted that where a shipowner charters a vessel, and the vessel is subsequently subchartered, the shipowner has no rights to invoke the arbitration clause of the subcharter, as "the shipowner is not a party to the subcharter." *Id.* (citing *Thyssen, Inc. v. M/V MARKOS V,* No. 97 Civ 6181 (MBM), 1999 WL 619634, at 3 (S.D.N.Y. Aug. 16, 1999), *Aff'd sub nom. Thyssen, Inc. v. Calypso Shipping Corp. S.A.,* 310 F.3d 102(2d Cir. 2002)). The *BS Sun* court held that conversely, the sub-charterer had no rights to invoke the subcharter's arbitration clause against the shipowner. In this case, the Plaintiff's assignor / subrogor was not party to any agreement with Defendant which contained an arbitration clause. As such, Plaintiff is unable to compel Defendant to arbitrate in London.

## V.     Plaintiff's Tort Claims are not legally cognizable against Defendant

### A.     Negligence

It is not at all clear which law applies to Plaintiff's substantive claims since other than the fact that Plaintiff elected to attach Defendant's asset in this Judicial District, this dispute has zero connection to the United States. The choice-of-law analysis provided by the Supreme Court in *Lauritzen v. Larsen,* 345 U.S. 571, (1953) will determine the applicable law. *See also Hawkspere Shipping Co. v. Intamex, S.A*., 330 F.3d 225, 234 (4th Cir. 2003). Under *Lauritzen,* a court must consider seven factors in determining the governing law for a particular dispute: (1) the place of the wrongful act, if any; (2) the law of the flag; (3) the domicile of the plaintiff; (4) the domicile of the shipowner; (5) the place of the contract; (6) the inaccessibility of a foreign forum; and (7) the law of the forum. 345 U.S. at 583–92. The laws of

Greece, the Republic of Liberia, Iran, Indonesia, the United Kingdom, and the United States are all potentially applicable to Plaintiff's purported claims.

However, the undisputed fact is that the Charterer was responsible to safely load and stow the cargo and Interfer's supercargo monitored the cargo from loading to discharging, which seriously undercuts any notion that Defendant breached any duty it owed to Interfer. The plain text of the sub-charter provides that Interfer as sub-charterer is responsible for loading and stowing the cargo. (Kokkinis Decl. Exhibit 4, ¶ 5(a)). Plaintiff's appointed supercargo was contractually required to monitor the cargo on board at every stage. Despite this language, Plaintiff has attached Defendant's property and claims that Defendant is somehow liable under some unspecified country's law. Interfer's purported claim that Defendant owed it a duty of some kind is likewise undercut by the fact that Interfer's only connection to the cargo at issue is through a fraudulent bill of lading. As the party bearing the burden to show reasonable grounds for this attachment, Plaintiff cannot demonstrate it possesses a viable tort claim against Defendant. As such, Plaintiff has no *prima facie* maritime claim and the attachment should be vacated.

### B.    Bailment

Bailment is the delivery of goods or personal property to the bailee in trust, under an express or implied contract, which requires the bailee to perform the trust and either to redeliver the goods or otherwise dispose of the goods in conformity with the purpose of the trust. *Ice Fern Shipping Co. v. Golten Serv. Co.,* No. 1:04-CV-20741, 2005 WL 3692840, at *2 (S.D. Fla. Mar. 22, 2005). Under general admiralty law, bailment does not arise unless delivery to the bailee is complete and the bailee has exclusive possession of the bailed property, even as against the property owner. Here, Plaintiff's Complaint fails to allege either exclusive control or the existence of privity between itself and Smooth. Further, incontrovertible evidence establishes that Interfer-

18

Steel maintained control of the cargo through the permanent presence of its appointed supercargo onboard the Vessel.

To prevail under the bailment theory, there must have been a bailment relationship between the claimant and the ship owner or manager. *Man Ferrostaal, Inc. v. M/V Akili*, 704 F.3d 77, 88 (2d Cir. 2012); *See also Rationis Enters. Inc. of Pan. v. Hyundai Mipo Dockyard, Co., Ltd.,* 426 F.3d 580, 587 n. 3 (2d Cir.2005). A "bailment does not arise unless delivery to the bailee is complete and he has exclusive possession of the bailed property." *Id.* (quoting *Thyssen Steel Co. v. M/V Kavo Yerakas,* 50 F.3d 1349, 1355 (5th Cir.1995)). When a charterer has taken responsibility for stowage of cargo aboard a ship, the ship owner does not have exclusive possession and cannot be held liable as a bailee. *Id.* Therefore, "no inference of negligence against the bailee arises if his possession of the damaged bailed property was not exclusive of that of the bailor." *Man Ferrostaal, Inc.*, 704 F.3d at 88; *United States v. Mowbray's Floating Equip. Exchange, Inc.,* 601 F.2d 645, 647 (2d Cir.1979); *Pan–Am. Petrol. Transp. Co. v. Robins Dry Dock & Repair Co.,* 281 F. 97, 107 (2d Cir.1922).

Here, the head charter party between Smooth and Sandor provides that Sandor was to provide a supercargo to monitor the cargo and oversee its stowage and transport. (Kokkinis Decl., Exhibit 1). Indeed, the supercargo designated by the Plaintiff attended on board the Vessel from the inception of loading of the cargo and was aboard the Vessel until discharge of the cargo was complete. (Kokkinis Decl., Exhibit 6, ¶ 1.7, ¶ 5.3). Throughout the voyage, the supercargo conducted daily monitoring of the cargo temperature of all holds. (*Id.*).

Further, the sub-charter party between Sandor and Interfer-Steel provided that Interfer-Steel was responsible to load and stow its cargo. Thus, there is no possibility that Plaintiff can satisfy its burden to show exclusive control by Defendant. It hasn't even plead exclusive control.

**VI.     A Manifest Want of Equity on the Part of the Plaintiff Warrants Vacatur**

Plaintiff's failure to advise the Court of the complete circumstances forming the basis of its cargo claim, specifically the fraudulent bills of lading and sub-charter party provisions authorizing same, warrants *vacatur* of the attachment order.  *See Noble Res. Pte. Ltd v. Metinvest Holding Ltd*., 622 F. Supp. 2d 77, 82–83 (S.D.N.Y. 2009) (citing *Maersk, Inc. v. Neewra, Inc.,* 443 F.Supp.2d 519, 528 (S.D.N.Y.2006) (because attachment is an equitable remedy, a district court has "inherent authority to vacate an attachment 'upon a showing of "any improper practice" or a "manifest want of equity on the part of plaintiff" '") (in turn quoting *Blake Mar., Inc. v. Petrom S.A.,* No. 05 Civ. 8033(PAC), 2005 WL 2875335, at *2 (S.D.N.Y. Oct. 31, 2005)) (quotations and citations omitted).  Parties proceeding on an *ex parte* basis have a special obligation to ensure that the representations they are making to the Court, and the facts they are verifying in a verified complaint, are true.  *Noble Res. Pte. Ltd v. Metinvest Holding Ltd.,* 622 F. Supp. 2d 77, 83 (S.D.N.Y. 2009)(internal citations omitted); *Transfield ER Cape Ltd. v. STX Pan Ocean Co. Ltd.,* No. 09 Civ. 1250(JGK), 2009 WL 691273, at *4 (S.D.N.Y. Mar. 17, 2009) ("In ex parte proceedings such as Rule B attachments, parties have a heightened obligation to bring material facts to the attention of the Court, even, and indeed, particularly when they are adverse.")

Plaintiff's *ex parte* restraint of Defendant's Vessel based on incomplete submissions which omit Plaintiff's unclean hands and outright fraud must not be condoned.  Its failure to even acknowledge the fraudulent bills of lading should tell the Court all It needs to know about Plaintiff's claims.

## **CONCLUSION**

Based upon the foregoing, the Defendant prays that this Court set an immediate hearing at which Plaintiff must show cause as to why this attachment should not be vacated.


Respectfully submitted, this 20th Day of February 2020 at Charleston, South Carolina.

|  | WOMBLE BOND DICKINSON (US) LLP |
|---|---|
|  | */s/ Ryan Gilsenan*_____ |
|  | Ryan D. Gilsenan, Fed ID No. 9837 |
|  | 5 Exchange Street |
|  | P.O. Box 999 |
|  | Charleston, South Carolina 29401 |
|  | (843) 720-4617 |
|  | Email: |
|  |       Ryan.gilsenan@wbd-us.com |
|  |  |
|  | Thomas L. Tisdale (*Pro Hac Vice forthcoming*) |
|  | Timothy J. Nast (*Pro Hac Vice forthcoming*) |
|  | Tisdale Law Offices, LLC |
|  | 200 Park Avenue, Suite 1700 |
|  | New York, New York 10166 |
|  | (212) 354-0025 |
|  | Email: |
|  |       ttisdale@tisdale-law.com |
|  |       tnast@tisdale-law.com |
|  |  |
|  | *Counsel for the Defendant Smooth Navigation S.A.* |