IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
IN ADMIRALTY

Carl Schroter GmbH & Co. KG,           :
                                       :
                    Plaintiff,         :          Civil Action No.: 2:20-cv-334-RMG
                                       :
vs.                                    :
                                       :
Smooth Navigation S.A.                 :
                                       :
                    Defendant.         :
                                       :

## DECLARATION OF MICHAIL KOKKINIS IN SUPPORT OF MOTION TO VACATE

I, Michail Kokkinis, declare pursuant to 28 U.S.C. § 1746 (1) as follows:

1.      I hold the position of President / Director with the Defendant Smooth Navigation, S.A. ("Smooth") and am familiar with the facts and circumstances of this matter. At all material times, Smooth was the Owner of the M/V EVOLUTION ("Vessel").

2.      I am of legal age, understand and believe in the obligations of an oath, and am authorized to make this declaration on behalf of the Defendant Smooth.

3.      This case concerns the shipment of direct reduced iron ("DRI") from Bandar Abbas, Iran to Surabaya, Indonesia pursuant to a charter party between Smooth and Sandor Shipping, O.U. ("Sandor"), as Charterers.

4.      Attached hereto as **Exhibit 1** is a true and accurate copy of the June 15, 2018 charter party between Smooth and Sandor ("head charter party"). Under the head charter party, Sandor had the right to sub charter the Vessel with "Charterers' remaining responsible for the fulfillment of this Charter Party."

5.     The head charter party provides that all bills of lading are to be in strict conformity with the Mate's Receipts and that, if loading is to occur in Iran, the Iran port of loading will be clearly mentioned on the bills of lading under all circumstances. Attached hereto as **Exhibit 2** are true and accurate copies of the Mate's Receipts issued for these shipments.

6.     Smooth was aware that the subject cargo would be loaded in Iran. This loading occurred at a time when US sanctions did not prohibit loading this cargo in Iranian ports.

7.     Upon the completion of loading at Bandar Abbas, Iran, on June 28, 2018, three bills of lading were issued by the Charterers' local agent on behalf of the Master. (True and accurate copies of the correct bills of lading attached hereto as **Exhibit 3**). Each bill of lading identified a different shipper: Dubral Industries, Pars Diba, of Tehran, Iran, Banyan Co. of Tehran, Iran and the Pension Fund Trading Company. The bills of lading were all non-negotiable and consigned to CGT Middle East, Dubai, UAE. Each bill of lading identified Bandar Abbas-Iran as the port of loading and Surabaya, Indonesia as the port of discharge.

8.     Almost one year after the discharge of the subject cargo in Indonesia, Plaintiff presented a $1.5 million claim for cargo damage to the London P&I Club, Smooth's protection and indemnity insurers, and provided  for the first time the sub-charter between Sandor and newcomer Interfer-Steel and Commodities FZE ("Interfer-Steel") as well as a different and previously undisclosed bill of lading.

9.     Unbeknownst to Smooth, in Sandor's sub-charter with Interfer-Steel **(Exhibit 4)**, the parties agreed that Interfer-Steel has the option to issue bills of lading showing Jebel Ali as the port of loading even if this is not the true load port. Effectively, Interfer- Steel was authorized by Sandor in the sub-charter to issue fraudulent bills of lading.

2

10.     Instead of being non-negotiable and consigned to CGT Middle East, the unauthorized bill of lading that was issued under this sub-charter was consigned "To Order," making it a negotiable document.  And instead of identifying the load port as Bandar Abbas, Iran, the port of loading was identified as Jebel Ali, Dubai, UAE.  This bill of lading does not conform to the Mate's Receipts and was not authorized, approved or signed by the vessel's Master or Smooth.  A copy of the fraudulent bill of lading is attached hereto as **Exhibit 5**.

11.     Like the sub-charter, Smooth was unaware until the claim for cargo damage was presented by Plaintiff that this unauthorized bill of lading was issued for this cargo.

12.     Smooth was not a party to the sub-charter party between Sandor and Interfer-Steel and was completely unaware of its terms until receiving them nearly a year after discharge of the cargo in connection with the claim.

13.     The head charter party provides that "Shippers is appointing the specialized MIL supercargo on board the vessel all the time till the completion of discharging. Shippers will be responsible for the Surveyors/Supercargo appointed by MIL."

14.     The supercargo was responsible for the cargo at all times from loading to discharge and exercised control over the cargo to the exclusion of Smooth or parties for whom Smooth is responsible.

15.     The appointed supercargo monitored the cargo on a daily basis from the time when the cargo was loaded until the Vessel arrived at Surabaya, Indonesia on 17 July 2018. Attached hereto as **Exhibit 6** is a true and accurate copy of the Boyd Marine Consultants Final Report dated August 15, 2018.

16.     The supercargo, Me Ewe Hye Keat of MIL, was apparently instructed by CGT who is the named consignee and notify party under the original authorized bill of lading issued

3

by the Vessel's Master. CGT was the FOB seller of the cargo to Interfer-Steel as evidenced by commercial invoice no: CGTME-JB-636/18 dated 28.06.2018. This invoice is attached hereto as **Exhibit 7**. In turn, Interfer-Steel appears to have sold the cargo to PT Ispat Indo on CIF terms as evidenced by commercial invoice mo. 5124-00329, also dated 28.06.2018. This invoice is attached hereto as **Exhibit 8**.

17.     If Smooth is forced to pay or secure the claim brought by the sellers (Interfer-Steel) of the cargo, who had no title to the goods when the cargo arrived at Surabaya, it would remain fully exposed to a direct claim by the receivers of the cargo who is the party with title to the goods and therefore the only party that has the right to claim for the damage to the cargo.

18.     For the sake of clarity, Smooth denies that the cargo was damaged while in its custody and control and the evidence shows that the cargo was damaged due to inherent vice.

19.     I have been advised by the vessel's P&I Club that, due to the Iranian nexus, they are not able to issue the usual Letter of Undertaking as security in lieu of the vessel to release the Vessel from this attachment.

20.     Every day the Vessel remains under attachment in Charleston, Smooth suffers significant monetary and reputational harm.

21.     There is no possibility of substitute security in this case since the Vessel's insurer cannot issue such substitute security as a result of the Iranian load port of the cargo. Smooth itself is unable to post security in lieu of the Vessel.

22.     If the attachment is not vacated promptly and the Vessel remains under attachment, Defendant Smooth will no longer be able to stay in business and Defendant will lose the Vessel to a party who was engaged in fraud and lacks standing to even bring this claim.

I Michail Kokkinis declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 20, 2020

_____

Michail Kokkinis
President / Director of Smooth Navigation, S.A.

# EXHIBIT 1

REF. NR: 4717477

DATE RECEIVED:  15/06/2018 17:28:06

FROM:  EAST MEDITERRANEAN TRADING & SHIPPNG INC [chartering@eastmedinc.com]

TO: [chartering@sandorsm.com],[operations@sandorsm.com]

REF. NR:  4717477

SUBJECT:  Fw: Re: M/V EVOLUTION/ SANDOR SHIPPING - absol fixing terms(Ref No:3705130) (Ref No:3706471)

KEYWORDS: VOY.35

PRINTED BY:  MANOLESOU KATERINA

---

ATTACHMENTS:  audit report.pdf, Blank Baltic99.docx, MV EVOLUTION.DESC.JULY 2018.docx, S823 CSL Certificate Sandor Shipping OU.PDF, S823 FDD Certificate Sandor Shipping OU.PDF, Sandor Shipping Background.pdf

---

Our Msg No.: 3706471

ANDREW/STAVROS

PLS FIND HEREUNDER RECAP ON SUBS AS AGREED DURING CLEAN NEGOTIATIONS BETWEEN OWNERS AND CHARTERERS AS FOLLOWS .

PLS CONFIRM IN LINE WITH OUR EXCHANGES BY RETURN MAIL

QTE

- SUBJECT CHARTERER'S RECONFIRMATION BY COB TODAY 15TH JUNE 2018 (18.00 HRS GMT)

- SUBJECT STEM/SHIPPERS APPROVAL TO BE LIFTED BY 12.00 HRS NOON HAMBURG TIME TOMORROW 16TH JUNE 2018

- SUBJECT RECEIVING OWNERS PNI/H&M APPVL OF CHRS DULY FILLED UP QSTRES (ATTACHED) .  ONCE APPROVED , AND ON LIFTING SUBS CHRS TO SIGN/STAMP AND SEND BY SCANNED COPY BACK .

- M/V EVOLUTION : AS DESCRIBED IN THE ATTACHED TC DESC ,  SEE ALSO B QSTRE

10/07/2018 04:19 PM                                                                                      Page 1 Of 19

REF. NR: 4717477

- VSL'S TANKTOP DIMS AND STRENGTHS - ALL IN B QSTRE ALS ATTACHED

ITINERARY : VSL SPOT OFF RAS AL KHAIR , AWAITING ORDERS

LAST 3 CGOES  : PETCOKE IN BULK , CURRENT / UREA IN BULK , MOP IN BULK

LAST 5 PORTS OF CALL  :  RAS AL KAHIR , FUJAIRAH , VIZAG , CHITTAGONG , RUWAIS

AGENTS' CONTACT DETAILS :   N/A

- VSL"S DESCRIPTION: "WOG" TO BE DELETED FROM DESCRIPTION (IF ANY) PLS
  ADD 'AND TO APPLY THROUGHOUT THE CHARTER' AFTER 'ALL DETAILS ABOUT';

- PLS ADV OWNERS/MANAGERS FULL STYLE :-

Head owners/ Registered Owners: SMOOTH NAVIGATION S.A.

Address:  MARSHALL ISLANDS

DISPONENT OWNERS:  NONE

Vessel' Managers: BETA MARITIME CORP.

     Person in charge: Capt. Dimitris Lois

     Address: 57, AKTI MIAOULI 5TH FLOOR,PIRAEUS 18536 , GREECE

     Tel:  00302104295013

     Fax:  00302104292346

- OWNERS CONFIRM VESSEL IN ALL WAYS FITTED FOR PERFORMANCE OF THE CHRTRS

TRIP AND HAS ALL VALID CERTIFICATES THROUGHOUT THE DURATION : OK

REF. NR: 4717477

WARRANTIES:

AA) OWNERS CONFIRM THAT ON VSL'S DELIVERY TO CHARTERERS SERVICE, VSL WILL BE
FULY SEAWORTHY AND OWNERS WILL EXERCISE DUE TO DILIGENCE IN ORDER TO MAINTAIN SAME  :OK

BB) VESSEL'S ITINERARY: AWAITING ORDERS , RAS AL KHAIR

CC) OWNERS AND CP CHAIN:


head owners/ Registered Owners: SMOOTH NAVIGATION S.A.

Address:  MARSHALL ISLANDS

DISPONENT OWNERS:  NONE

Vessel' Managers: BETA MARITIME CORP.

   Person in charge: Capt. Dimitris Lois

   Address: 57, AKTI MIAOULI 5TH FLOOR,PIRAEUS 18536 , GREECE

   Tel:  00302104295013

   Fax:  00302104292346


DD) OWNERS CONFIRM VESSEL IS COMPLETELY PANDI COVERED, WHICH SHALL BE MAINTAINED THROUGH OUT THE PERIOD OF THIS CHARTER. OWNERS TO CONFIRM VESSEL'S P&I CLUB IS AMONG THE LIST OF THE IG CLUBS


OWS: PLEASE ADVISE : PNI CLUB - THE LONDON

EE) OWS GTEE VSL FULLY ISSC/ISM COVERED FOR ENTIRE DURATION OF THIS CP. OWNERS CONFIRM VESSEL MEETS ALL IMO STANDARDS. : OK

FF) OWS GTEE VSL FULLY P+I/H+M/ITF OR EQUIVALENT COVERED FOR ENTIRE DURATION
THIS CP. : FULLY COVERED , REF ITF INSERT ' OR EQUIVALENT ACCEPTABLE TO ITF  ': OK

GG) OWS GTEE VSL CLASSED HIGHEST LLOYDS/EQUIV ENTIRE DURATION THIS CP.  : OK

HH) OWNERS/VESSEL TO COMPLY WITH ALL APPLICABLE RULES/REGULATIONS /LAWS RELEVANT TO WATER AND/OR AIR POLLUTION AT PORTS OF CALL AT THEIR RISK AND EXPENSES. : OK

II) OWNERS CONFIRM VESSEL IS NOT BLACKLISTED BY ANY TERMINALS OR ANCHORAGES. : OK

REF. NR: 4717477

JJ) VESSEL IS IN CONFORMITY WITH UNITED STATES LAW (INCLUDING RESTRICTIONS IMPOSED BY U.S TREASURY DEPARTMENT OFFICE OF FOREIGN ASSETS CONTROL) AND
UNITED NATIONS PROCLAMATIONS PROHIBITING CERTAIN FLAGS/OWNER/MANAGEMENT FROM
PARTICIPATING IN THE TRADE COVERED BY THIS AGREEMENT IF ANY. : OK

KK) VESSEL'S LAST 3 CARGOES: PLEASE ADVISE. : LAST 3 CGOES  : PETCOKE IN BULK , CURRENT / UREA IN BULK , MOP IN BULK


LL) OWNERS TO PROVIDE VESSEL'S ALL VALID CERTIFICATES AFMT : OK

MM) OWNERS CONFIRM VESSEL IS SELF TRIMMING BULK CARRIER (WING/DEEP TANKS EXCLUDED) : OK

NN) OWNERS CONFIRM VESSEL IS IN ALL RESPECTS SUITABLE FOR THE SAFE LOAD, SAFE CARRIAGE AND DISCHARGE OF DRI B  IN BULK PROVIDED THAT THE  AND THAT ALL PERTAINING
INTERNATIONAL CERTIFICATES ARE ON BOARD AND AVAILABLE TO CHTRS ON REQUEST. : YES FOR DRI B , SUBJECT TO PWS DRI B PROCEDURE/CLAUSE

OO) OWNERS CONFIRM VESSEL IS SUITABLE FOR GRAB DISCHARGE. ALSO CHARTERERS TO
HAVE FREE USE OF VESSEL'S GEAR WHICH TO BE LEFT IN FULL WORKING ORDER FOR IMMEDIATE USE THROUGHOUT THE CURRENCY OF THE CHARTER PARTY AND WINCHES SERVE
ALL THE HATCHES. : OK

PP) VESSEL NOT TO CHANGE OWNERSHIP AND/OR CLASS WITHOUT CHARTERERS \WRITTEN
CONSENT. : OK

QQ) OWNERS CONFIRM VESSEL'S HULL AND MACHINERY INSURANCE SHALL BE FULLY MAINTAINED AND WILL NOT BE CHANGED. : OK


RR) VESSEL NOT TO BE SCHEDULED FOR BREAK UP OR SOLD FOR SCRAP DURING THIS CHARTER RESPECTIVELY UPON COMPLETION OF THIS CHARTER. : OK

- OWNERS CONFIRM THAT THE VESSEL IS STANDARD RIGHTSHIP APPROVED AND VESSEL
DOES NOT HAVE ANY DETENTION HISTORY FOR THE LAST 36 MONTHS. :  NOT RIGHTSHIP APPROVED

- OWNERS CONFIRM THAT THERE ARE NO OUTSTANDING CLAIMS / LAW SUITS ON FINANCIAL AND DAMAGE ASPECTS AGAINST OWNERS. OWNERS ALSO CONFIRM THAT MORTGAGE PAYMENTS ARE UPTODATE AND THEY ARE NOT IN DEFAULT. : CONFIRM

- OWNERS CONFIRM THAT DURING PREVIOUS 12 MONTHS VESSEL HAS HAD NO GROUNDING
/ STRANDING / COLLISION / SERIOUS ACCIDENT / POLLUTION INCIDENT. : CONFIRM

TT) VESSEL HAS NO PENDING ENCUMBRANCES/LIENS/ARREST ORDERS OR RECOMMENDATIONS THAT MAY HINDER THE PERFORMANCE OF THE VOYAGE UNDER

REF. NR: 4717477

THIS
CHARTER PARTY. : CONFIRM

UU) VESSEL NOT TO HV ANY COLLISION HISTORY IN THE LAST 6 MOS : CONFIRM


VV) VESSEL TO HAVE MIN CRANE OUTREACH OF 9MTRS :
   OUTREACH (METRES) OF GEAR:-
   A. BEYOND SHIP'S RAIL    NO1,2,3,  9 MTRS / NO4   11 MTRS
   B. BEYOND SHIP'S RAIL WITH MAXIMUM CARGO LIFT ON HOOK    SAME


WW) OWNERS CONFIRM VSL CAN SUPPLY UNINTERRUPTED POWER TO SHORE
GRABS/BAGGING , PLANTS AT 440V/204KW/73AMP/60HZ FREE OF COST TO CHRTS. :-

Vsl can supply 440 V/73 AMP/ 60 HZ , BUT ONLY 800 kw in total AND CAN WORK AT SAME
TIME BY 3 CRANES AND 3 GRABS   (NOT 4 SIMOULTANEOUSLY)


XX) OWNERS GUARANTEE THAT THE VESSEL IS, AND SHALL REMAIN, FREE FROM ANY
OBLIGATION, ENCUMBRANCE, CLAIM, OR LIEN THAT WOULD INTERFERE IN ANY WAY
WITH THE VESSEL'S PERFORMANCE AND/OR DELIVERY OF CARGO WITH THE UTMOST
DISPATCH; AND THAT ALL BUNKERS RECEIVED ON BOARD THE VESSEL PRIOR TO THE
COMMENCEMENT OF THIS CP HAVE BEEN FULLY PAID.  IN THE EVENT THE VESSEL IS
ARRESTED OR DETAINED DURING THE CURRENCY OF THIS CHARTER PARTY DUE TO
OWNER'S BREACH OF THIS CLAUSE, THEN OWNERS SHALL TAKE IMMEDIATE ACTION
TO RELEASE THE VESSEL AND SHALL REMAIN FULLY RESPONSIBLE FOR ANY
RESULTING COSTS OR DAMAGES CAUSED BY ANY INTERRUPTION OF THE VESSEL'S
PERFORMANCE.  IN THE EVENT THE ARREST OR DETENTION LASTS FOR MORE THAN
FIVE (5) CALENDAR DAYS, THEN OWNERS SHALL ARRANGE FOR THE IMMEDIATE
TRANSSHIPMENT OF CARGO TO ITS INTENDED DISCHARGE PORT(S) AT OWNERS TIME
AND EXPENSE.  CHARTERERS SHALL HAVE THE RIGHT TO TERMINATE THIS CP
IMMEDIATELY SHOULD OWNERS BE IN BREACH OF ANY PART OF THIS CLAUSE.
OWNERS CONFIRM THAT CHARTERERS MAY PROCURE  BUNKERS, SUPPLIES,
NECESSARIES, OR SERVICES FOR THE VESSEL ON THEIR OWN (CHARTERER'S)
ACCOUNT.  IF REQUESTED, CHARTERERS WILL PROVIDE EVIDENCE OF PAYMENT
THEREOF TO THE OWNERS AS SOON AS POSSIBLE AFTER THE DUE DATE OF PAYMENT
FOR THE SUPPLIES.   NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS
CHARTERPARTY, CHARTERERS AND SUPPLIERS SHALL NOT BE REQUIRED TO SIGHT,
ACKNOWLEDGE, OR SIGN ANY NON-LIEN NOTICE.


FOR


-ACC "SANDOR SHIPPING"

laiakula village,kaara tee 32 viimsi rural municipality, harju county, estonia

EMAIL: CHARTERING@SANDORSM.COM      - CHARTERING DEPT. (HANDY, SMX, PMX)


- CHRS FULL BACKGROUND/AUDIT REPORT AND AND VALID/UPTODATE PNI ENTRY
CERT AS ATTACHED

REF. NR: 4717477

-OWNERS: PLS ADVISE FULL STYLE :

head owners/ Registered Owners: SMOOTH NAVIGATION S.A.

Address:  MARSHALL ISLANDS

DISPONENT OWNERS:  NONE

Vessel' Managers: BETA MARITIME CORP.

    Person in charge: Capt. Dimitris Lois

    Address: 57, AKTI MIAOULI 5TH FLOOR,PIRAEUS 18536 , GREECE

    Tel:  00302104295013

    Fax:  00302104292346

-DELIVERY: DOP RAS AL KHAIR ATDNSHINC

LAYCAN:  00.01 HRS 15TH - 23.59 HRS 16TH JUNE 2018 .

IN THE EVENT THAT ALL SUBJECTS ARE LIFTED BY 12.00 HRS NOON HAMBURG TIME
16TH JUNE , VESSEL TO BE CONSIDERED ON HIRE RETRO ACTIVELY AS FROM

12.00 HRS GMT 15TH JUNE 2018 .

- TRIP/ CARGO INTENTION/ DURATION

==================================

FOR ONE TIME CHARTER TRIP ' ALWAYS TRADING VIA SAFE PASSAGES , SAFE

APPROACHES , SAFE ANCHORAGES/ SAFE BERTHS/SAFE PORTS/ AA AND ALWAYS
AFLOAT AT

ANY TIME OF TIDE ,  AWIWL AND INL CARRYING DRI B IN BULK VIA IRAN (INTN BANDAR
ABBAS)TO BE LOADED AS THE BELOW DRI B CLAUSE

REF. NR: 4717477

IN ACCORDANCE TO LATEST IMSBC RULES, REGULATIONS AND GUIDELINES, DURATION ABOUT 20/25 DAYS WOG TO INDONESIA (INT SURABAYA)

AFTER COMPLETION OF LOADING IN BANDAR ABBAS CHARTERERS HAVE THE OPTION TO

CALL ANOTHER PORT (INT KHOR FAKKAN) TO MAKE A CLEARANCE.

INT. OF BUNKERING IN JEBEL ALI OR FUJAIRAH (BEFORE OR AFTER LOADING).

-RE-DELIVERY: DLOSP SPORE-JPN RGE PICO ATDNSHINC

-BOD : BUNKER CLAUSE

=================

CHARTERERS WILL REPLENISH BUNKERS AND REDELIVER THE VESSEL WITH ABOUT SAME

BUNKER QUANTITIES FOR BOTH GRADES ON DELIVERY, WITH A MAX TOLERANCE OF 5%

MORE OR LESS.

ANY DIFFERENCES ON BUNKER FIGURES TO BE SETTLED ALONG WITH FINAL HIRE

STATEMENT.

BUNKERING IN IRAN AND INDIA IS NOT ALLOWED.

CHARTERERS WILL NOT PAY FOR BUNKERS ON BOARD ON DELIVERY , HOWEVER ,

CHARTERERS WILL GUARANTEE TO REPLENISH IFO 380 CST AND ULSMGO TO THE VESSEL

PRIOR TO REDELIVERY IN ORDER TO

SAFE MEET SAME QUANTITIES AS ON BOARD ON DELIVERY (MAX 5% TOLERANCE M/L

ALLOWED).

REF. NR: 4717477

INCASE ISO 8217/2010 SPECS ARE NOT AVAILABLE, THEN CHARTERERS HAVE THE RIGHT

TO REPLENISH ISO 8217/2005 SPECS.


PLS ADVISE BUNKER QUANTITIES ON DELIVERY : ABT 220-270 MTS IFO 380 CST , ABT

20-30 MTS ULS MGO : MASTER TO ADVISE EXACT QTIES ON ACTUAL DELIVERY


PRICES BOTH ENDS:

USD 460 FOR HSIFO

USD 748 FOR MDO/ULSMGO


- HOLDS CONDITION ON ARRIVAL FIRST LOADPORT , VSL'S HOLDS TO BE SWEPT, CLEAN, WASHED DOWN BY WATER,DRY AND IN ALL RESPECTS READY

TO RECEIVE CHTRS' INTENDED CGO OF DRI B AND BE FREE OF LOOSE RUST LOOSE RUST SCALE AND RESIDUE OF PREVIOUS

CGO TO THE SATISFACTION OF A MUTUALLY ACCEPTABLE JOINT HOLDS CONDITION SURVEY TO BE CONDUCTED JOINTLY BETWEEN SHIPPER'S SURVEYOR AND OWNERS PNI CLUB SURVEYOR . OWNERS PNI CLUB SURVEYORS COSTS TO BE OWNS ACC . PHOTOGRAPHIC EVIDENCE WILL BE PROVIDED TO HELP ASCERTAIN THE JOINT CONDITION SURVEY . THE FINDINGS OF THE JOINT SURVEY WILL BE FINAL AND BINDING BETWEEN BOTH PARTIES . SHOULD VESSEL FAIL TO PASS THE JOINT SURVEY HOLD INSPECTION, VSL TO BE PLACED OFF- HIRE (PRO RATA PER HOLD AFFECTED) FM THE MOMENT OF REJECTION UNTIL SHE PASSES INSPECTION AND ALL ADDITIONAL DIRECLTY RELATED AND PROVEN CLEANING EXPENSES ARE TO BE FOR OWNERS ACCOUNT, HOWEVER , OWNERS WILL NOT BE OBLIGED TO USE SHORE LABOUR TO CLEAN THE HOLDS AND MAY USE CREW IF NECESARRY .IN CASE OF STEVEDORE STANDBY

CHARGES , DIRECTLY RELATED TO UNCLEAN HOLDS , SAME TO BE FOR OWNERS ACCOUNT BUT LIMITED TO MAX ONE SHIFT OF THE GANG ACTUALLY CANCELLED .


IN CASE VESSEL COMMENCES LOADING ON PASSED HOLDS THEN VESSEL TO BE OFF-HIRE ON PRO RATA BASIS .


- CGO INT DRI-B : SEE BELOW DRI B CLAUSE


- HIRE:  USD 13,250  DIOT

REF. NR: 4717477

FIRST 15 DAYS DAYS HIRE PLUS USD 35,000 FOR HOLDS RECONDITIONING PLUS PIRACY PREMIUM OF USD 1,500 to be payed together with first hire .

HIRE IS PAYABLE EVERY 15 DAYS IN ADVANCE . NO OUTSTANDING HIRE BALANCES ARE ALLOWED ON VESSEL'S REDELIVERY , IE. ALL BALANCES TO BE FULLY PAID UP 48 BANKING HRS PRIOR TO REDELIVERY .

FIRST HIRE TO BE PAYED AS FOLLOWED :-

·            FIRST 15 DAYS ADVANCE HIRE PLUS HODS RECONDITION COST  PLUS PIRACY PREMIUM OF USD 1,500  PAYABLE WITHIN 2  EUROPEAN BANKING DAYS

FROM DELIVERY .    THEREAFTER , EVERY 10 DAYS IN ADVANCE .

ALL PAYMENTS TO BE MADE IN EURO , IN WHICH CASE THE RATE OF EXCHANGE OF USD/EURO TO BE AS PER THE ECB - REUTERS EXCHANGE RATE ON THE DAY OF TRANSFER.  ALL PAYMENT TO BE BASED ON PROFORMA INVOICES , NOT MENTIONING VESSEL NAME/IMO NR/ OR IRAN/CP  .  (SAMPLE INVOICE TO BE GIVEN LATER STAGE).

- DUR ABT 20/25 DAYS WOG

-CEV: 1350 PMPR

-ILOHC USD 35K INCLUDING DECK & SUPERSTRUCTURE : PAYABLE IN ADVANCE

- DRI PROCEEDURE:

PIPING WILL BE DONE WHILE THE VESSEL IS ON ANCHORAGE, VESSEL TO BE BROUGHT ALONGSIDE FOR LOADING IMMEDIATELY AFTER PIPING IS COMPLETED.

THE LOADING OPERATION SHOULD START IMMEDIATELY AFTER VESSEL IS ALONGSIDE THE BERTH.

REF. NR: 4717477

DURING THE LOADING THE SUPERCARGO WILL PLACE THE THERMOCOUPLES AND ONCE THE LOADING IS FINISHED EACH HOLD WILL BE SEALED BY TAPE AND FOAM.

THE NITROGEN PURGING WILL START RIGHT AFTER THAT UNTIL THE O² LEVEL REACHES LESS THAN 1%.

SPARE ISO TANK AND VAPORIZER WILL BE PLACED ON BOARD THE VESSEL.

LAYTIME WILL STOP COUNTING AFTER ALL ABOVE MENTIONED HAS BEEN FINISHED.


-       DRI-B CLAUSE:


CARGO DESCRIPTION  : CHARTERERS ARE PERMITTED TO LOAD A CARGO OF "  DIRECT REDUCED IRON B "  (GROUP B , CLASS MHB -  COLD MOULDED  BRIQUETTES ,


PELLETS , LUMPS) ALWAYS IN ACCORDANCE TO THE REQUIREMENTS IMSBC CODE 2016 EDITION PAGES 171-174 INCLUSIVE (SEE ATTACHMENT).


- OWNERS SHALL HAVE THE LIBERTY OF APPOINTING THEIR CARGO SPECIALIST SURVEYOR (MIL) AND/OR THEIR PNI SUREVEYOR TO CONDUCT A THOROUGH SURVEY OF THE CARGO PRIOR TO LOADING AND BE PRESENT DURING LOADING AND/OR DURING THE VOYAGE IF NECESARRY IN ORDER TO ENSURE THAT THE CARGO IS LOADED/STOWED AND CARRIED IN ACCORDANCE TO THE IMSBC CODE/IMO REGULATIONS, Shippers is appointing the specialised MIL Supercargo on board the vessel all the time till the completion of discharging. Shippers will be responsible for the Surveyors/Supercargo appointed by MIL


- CHARTERERS ARE TO SUPPLY MASTER/OWNERS WITH MSDS CERTIFICATE ISSUED BY THE SHIPPERS/PRODUCERS , EVIDENCING THAT CARGO IS IN STRICT CONFORMITY WITH LATEST SOLAS , IMO REGULATIONS AND IMSBC CODE .


- THE CARGO IS ALWAYS TO BE LOADED, STOWED, TRIMMED, CARRIED AND DISCHARGED IN ACCORDANCE WITH COMPETENT AUTHORITIES INCLUDING VESSELS REGISTRY, SOLAS, LOCAL AND LATEST IMSBC CODE.


- BEFORE LOADING CHARTERERS SHALL PROVIDE ALL CARGO INFORMATION REQUIRED BY THE IMSBC CODE OF SAFE PRACTICE FOR SOLID BULK CARGOES (IMSBC CODE) INCLUDING A SHIPPERS CERTIFICATE(S).


•   CHRTRS   / shippers is keeping an ISO tank of about 20MT Nitrogen gas and one vaporizer to inert the gas on board the vessel during the enroute to discharge port, which is more efficient than

REF. NR: 4717477

the Nitogen bottles/pallets. Master should be responsible for the safe loading/discharging and carriage of the equipment all the time. Vessel crew will be briefed to operate the Tank and Vaporizer in case of emergency and crew should operate the same in coordination with on board supercargo MIL Surveyor. Please rephrase the wording accordingly.

The Nitrogen Purging system , shall be fitted in accordance to MIL Surveyors' requirements . Cost of MIL Surveyors attendance for Charterers account.

IN ADDITTION , TO ALL THE ABOVE , THE CARGO CARRIAGE TO BE AS UNDER :

Carriage of cargo

a) Cargo to be loaded stowed carried and discharged in accordance with IMSBC regulations and recommendations. Master to ensure that the cargo is kept dry and properly maintained during loading and discharging and carried in accordance with IMSBC regulations, recommendations and guidelines.

b) Intended holds for loading this cargo to have natural ventilation to prevent build up of explosive atmosphere as per advice given by Shipper's technical department(s).

Charterers will provide and place adequate piping in holds to inert the cargo and will seal holds on completion of loading at their expense under advice by Supercargo and Master's direction and supervision.

c) Owners to allow a Supercargo on board from the day the vessel commences loading and until the completion of the discharging. Owners to provide him with a cabin and 3 meals and intermediate refreshments on board free of charge. Charterers to issue L.O.I. as per Owners P. and I. Club wording with respect to boarding of Supercargo.

d.Charterers' option to have 2 qualified technicians aboard the vessel from the time of arrival at the loading port until such time as vessel ready to sail.

These technicians may accompany the vessel on her whole voyage to monitor    and  record and relay temperatures and hydrogen/oxygen gas   contents at

regular intervals not exceeding 8 hours throughout the voyage in all the holds.

The technicians are to accompany the vessel at Chartereres' risk and expenses after providing Owners the standard Letter of Indemnity in Owners' P. & I. Club format.

Owners to furnish them with food and accommodation.

Any Charterers' or Supercargo's /Technicians' opinions/advice and comments on the safe

REF. NR: 4717477

carriage of this cargo not to relieve Master/Owners of their responsibilities and obligations in respect of the ship and the cargo.

) Charterers' privilege to load/discharge from all hatches at any time provided weather permitting. Vessel to supply light as on board for night work if required, free of charge to Charterers. It is also understood that Officers and Crew will cooperate in every respect for a smooth operation.

f)  Cargo monitoring equipment including Temp/Hydrogen/Oxygen Monitor4s and attending surveyors required as per IMSBC Code regulations and recommendation shall be for Shippers'/Charterers' account , free odf risk and expense to vessel .

g) the ship shall carry appropriate instrumentation for measuring the concentrations of hydrogen and of oxygen in the cargo spaces. Charterers to provide same at their expense.

h) Cargo temperature, oxygen and hydrogen concentrations are to be reported at an interval of not more than eight hours throughout the voyage.

i) In the absence on board of Charterers' Supercargo/Technicians , it will be the Master who shall advise Charterers by email or fax of the daily temperature of the cargo in all holds and of the oxygen and hydrogen levels during the voyage.

j) should the Master detect a significant abnormality in the temperature of the cargo during the voyage he will take action as a competent person for safe handling of the cargo.

k) Cargo (D.R.I. B ) to be adequately weathered and fully passivated for a minimum 72 hours prior to loading as per latest IMSBC Code regulations and any alterations to date either generally or specifically applicable to this cargo shall be recognized as such by the national administration of the country.

l) No open light, naked flame or smoking should be allowed in or near the vicinity of holds or vents containing D.R.I. B

IF  MASTER/CARGO SURVEYOR(MIL)/OWNERS P & I SURVEYOR HAS DOUBT ON THE CARGO SPECIFICATIONS AND/ OR TML / MOISTURE CONTENT ,

A JOINT SURVEY ON THE CARGO TO BE CARRIED OUT AT SHIPPER'S LAB, WITH THE ATTENDANCE OF THE OWNERS PNI REPRESENTATIVE AND CHARTERERS / SHIPPERS

REPRESENTATIVE. COST OF SURVEY TO BE EQUALLY SHARED . SHIPPERS LAB TO PERFORM THE CARGO SURVEY IN ACCORDANCE WITH THE LATEST IMSBC CODE.

THE FINDING OF THE JOINT SURVEY IS FINAL AND CONCLUSIVE AND IS BINDING FOR BOTH PARTIES.

LOI FOR DISCHARGING

========================

IN CASE ORIGINAL BS/L ARE NOT READY / DID NOT ARRIVE BEFORE VSL'S ARRIVAL TO

DISCHARGE PORT(S) THEN CHARTERERS HAVE THE OPTION TO INSTRUCT MASTER TO

DISCHARGE AND RELEASE ENTIRE CARGO AGAINST PRESENTATION OF AN LOI AS PER

REF. NR: 4717477

OWNER'S STANDARD P+I CLUB WORDING SIGNED BY CHRTRS

OK BUT INSERT' ALL LOIS TO BE ACCOMPANIED BY SCANNED COPY OF FRONT/BACK BL

PAGE, NON NEGOTIABLE COPIES OK).


BILL OF LADING CLAUSE TO READ AS FOLLOWS:-


QTE


== B/L CLAUSE:--------


OWNERS BILLS OF LADING CLAUSE:  ALL BILLS OF LADING TO BEAR  A CHARTER PARTY

DATE OF 5TH MAY 2018 ( CHARTERERS CHECKING AND REVERTING IF POSSIBLE ON  CP
DATE )



THIS CLAUSE SHALL BE AN INTEGRAL PART OF AND THE FIXTURE RECAP AND CHARTER

PARTY.


SIGNING OF BILLS OF LADING:  BILLS OF LADING ARE TO BE ISSUED AND SIGNED ONLY

BY MASTER, ALTERNATIVELY IF REQUIRED BY THE CHARTERERS TO BE ISSUED BY

CHARTERERS OR THEIR AGENTS OR THEIR NOMINEE ON MASTER'S BEHALF , BUT
ALWAYS

IN STRICT CONFORMITY WITH MATE'S RECEIPTS.


BILLS OF LADING WILL BE SIGNED BY CHARTERER'S AGENTS IN CHARTERER'S OPTION
IN DUBAI/ELSEWHERE .


PRIOR TO ISSUANCE OF ANY BILL/S OF LADING CHARTERERS ARE TO PROVIDE A
DRAFT

COPY, TO OWNERS FOR THEIR RECORDS AND APPROVAL.

REF. NR: 4717477

ONLY AFTER WRITTEN APPROVAL OF THE FINAL DRAFT WILL THE ORIGINAL B/L BE

ALLOWED TO BE ISSUED.


NO LINER , THROUGH, TRANSSHIPMENT OR COMBINED TRANSPORT OF BILLS OF
LADING

AND NO WAYBILLS ARE TO BE ISSUED UNDER THIS CHARTER PARTY. THE SAID CARGO
IS

TO BE RELEASED ONLY TO ITS LEGAL OWNERS AS STIPULATED IN THE BILLS OF
LADING.


THERE WILL BE NO SWITCH BILLS OF LADING BUT BILLS OF LADING WILL SHOW

DIFFERENT SHIPPER/CONSIGNEE/NOTIFY/DISCHARGE PORT THAN MATE RECEIPTS.

CHARTERERS WILL ISSUE LOI IN OWNERS WORDING IF REQUESTED


SWITCH BILLS OF LADING ARE ONLY ALLOWED , IF AND ONLY IF:-


1. ALL BILLS OF LADING ARE TO BE IN   STRICT CONFORMITY WITH MATE'S RECEIPTS.


2. THE PORT OF LOADING IN IRAN TO BE CLEARLY MENTIONED ON THE MATE'S

   RECEIPTS, CARGO MANIFESTS AND   BILLS OF LADING UNDER ALL CIRCUMSTANCES .

   FOR SWITCH BILLS OF LADING CHARTERERS ARE ALLOWED TO CHANGE THE
DISCHARGE

   PORT(S) (UNDER OWNERS P & I CLUB LETTER OF INDEMNITY) AND/OR NOTIFY PARTY

   AND/OR TO ORDER PARTY NAMED IN THE ORIGINAL BILLS OF LADING PROVIDED THE

   COMPLETE SET OF THE ORIGINAL BILLS OF LADING IS DELIVERED UP TO OWNERS'

   P&I REPRESENTATIVE IN LOADPORT OR IN PIRAEUS OFFICE OR IN UAE AT THE SAME

   TIME AS  THE NEW SET OF BILLS OF LADING ARE ISSUED AND RELEASED BY

   CHARTERER AGENT

   OR AT DISCHARGE PORT OWNERS P & I REPRESENTATIVE MARKED NULL AND VOID.

REF. NR: 4717477

ALL EXPENSES OCCURRED TO BE FOR CHARTERERS ACCOUNT.


NO PRE-DATED/BACK DATED BILLS OF LADING ARE ALLOWED TO BE ISSUED UNDER THIS

CHARTER PARTY


CHARTERERS ARE ONLY ALLOWED TO MAKE THE FOLLOWING CHANGES TO THE BILLS OF

LADING:-


CHANGE OF DISCHARGE PORT/S AND / OR 'NOTIFY PARTY', AND / OR 'TO ORDER PARTY'

AND/OR 'SHIPPERS'. HOWEVER, THE QUALITY, TOTAL QUANTITY, DESCRIPTION AND

CONDITION OF CARGO TO ALWAYS REMAIN UNCHANGED.

ANY OTHER ALTERATIONS THAT MAY BE REQUIRED IN ORDER TO COMPLY WITH THE LETTER

OF CREDIT , PROVIDED THAT THE PORT OF LOADING IN IRAN REMAINS UNCHANGED ,

WILL ONLY BE ALLOWED , WITH PRIOR WRITTEN CONSENT FROM THE OWNERS.


ADDITIONAL CLAUSES FOR BILLS OF LADING.


A.MASTER TO AUTHORIZE LOADPORT AGENTS/CHARTERER'S AGENTS TO ISSUE 3/3 OBL'S STRICTLY IN CONFORMITY WITH M/R's

 MARKED 'FREIGHT PAYABLE AS PER CHARTER PARTY OR FREIGHT PREPAID'

 DATED 5TH MAY 2018, UPON COMPLETION OF LOADING.


 B/L QTY  TO BE DETERMINED BY DRAFT SURVEY BENDS,


B.CARGO MAY HAVE REMARKS AND SAME CAN BE INSERTED INTO MRS AND B/L'S


C.THERE WILL BE NO SWITCH BILLS OF LADING BUT BILLS OF LADING WILL SHOW

 DIFFERENT SHIPPER/CONSIGNEE/NOTIFY/DISCHARGE PORT THAN MATE RECEIPTS.

REF. NR: 4717477

CHARTERERS WILL ISSUE LOI IN OWNERS WORDING IF REQUESTED

DISCHARGE WITHOUT PRESENTATION OF ORIGINAL BILLS OF LADING:

THE CHARTERERS TO ENSURE THE PRESENTATION OF THE ORIGINAL DULY ENDORSED BS/L

AT DISCHARGING PORT(S) PRIOR TO VESSEL'S ARRIVAL.

IF THE ORIGINAL BS/L ARE NOT AVAILABLE BY THE TIME OF THE VESSEL'S ARRIVAL AT

PORT OF DISCHARGE THE OWNERS SHOULD ALLOW TO DISCHARGE/ DELIVER THE CARGO

WITHOUT PRESENTATION OF THE ORIGINAL BS/L AGAINST PROVIDING WITH THE

CHARTERERS' LETTER OF INDEMNITY (HEREINAFTER AS "LOI") - SCANNED EMAIL

ATTACHED ORIGINAL COPY , ISSUED IN OWNER'S FORM AND WORDING TOGETHER WITH THE

COPY OF THE DULY SIGNED ORIGINAL CONGEN BS/L (FRONT AND BACK PAGES

INCLUSIVE) . THE LOI TO BE STAMPED AND SIGNED BY INK BY THE CHARTERERS' ONLY

DULY AUTHORIZED PERSON(CEO). A DRAFT OF THE LOI IS TO BE SENT TO OWNERS AT

LEAST 72 OFFICE HRS PRIOR TO ARRIVAL DISPORT/S . THE FINAL APPROVED LOI DRAFT

WHICH TO BE IN CONFORMITY WITH THE ORIGINAL BILLS OF LADING , WILL BE ISSUED

AND SENT BY SCANNED EMAIL ATTACHMENT TO OWNERS BUT HARD COPY TO FOLLOW BY

COURIER. - OK BUT HARD COPY MAY ARRIVE OWNERS DURING OR AFTER DISCHARGING AND

OWNERS WILL NOT REFUSE TO DISCHARGE IN CASE HARD COPY IS DELAYED

- NEGOS AND FIXTURE TO BE KEPT STRICTLY P+C

- AR/GA LDN, ENGLISH LAW TO APPLY

REF. NR: 4717477

-COMMISSIONS  :  3.75PCT ADC + 1.25 PCT EASTMED INC.

OFAC-BIMCO SACTIONS CLAUSE:

==============================

OFAC COMPLIANCE :-  CHRS TO FILL UP THE REQUIRED DUE DILIGENCE QSTRE  (AS PER SAMPLE ATTACHED)  WHICH PENDING APPROVAL  BY  OWNERS PNI CLUB AND HULL UNDERWRITERS .

OFAC AND BIMCO SANCTIONS CLAUSES TO APPLY , IE.-

OFAC clause:

1.0     The Owners warrant and undertake that throughoutthe currency

of this charter party:

1.1      the vessel shall not be named on the list of special designated

nationals and blocked persons (the 'SDN'' list) as published

and amended from time to time by the U.S.treasury department's

Office of Foreign Assets Control ('OFAC'); and

1.2      the vessel's registered Owner shall not be named on the SDN list; and

1.3      the vessel shall not be owned, chartered,operated or controlled

by any person or entity named on the SDN list; and

1.4      the vessel shall not be flagged or registered by a country that

is subject to the U.S. sanctions and laws administered by OFAC

from time to time ('the U.S. sanctions') and acceptance of the

vesel by Charterers shall not constitute a violation of U.S.

sanctions; and

1.5      the vessel shall not be owned or chartered by a per person or

entity that is registered, constituted or organised in, or that

is a citizen or resident of or located in, a country that is subject to the U.S.

REF. NR: 4717477

sanctions and acceptance

or trading of the vessel by Charterers would constitute a violation of U.S.

sanctions; and

1.6    acceptance and trading of the vessel by the Charterers throughout

the charter party duration shall notconstitute a violation of any sanctions laws of the United Nations, the

United Kingdom,the European Union, the United States of America, by the Charterers as if it were subject to such

sanctions laws, all as amended from time to time.

2.0    Should at any time during this charter partyOwners be in breach of any of the provisions and / or

warranties contained in this clause,

then:

2.1    Owners shall indemnify the Charterers against any losses or

damages whatsoever resulting; and

2.2    Charterers shall have the right to immediately cancel the

charter party.

BIMCO SANCTIONS CLAUSE TO ALSO BE INSERTED IN THE CP.

QTE

- BIMCO Sanctions Clause for Time Charter Parties

(a) The Owners shall not be obliged to comply with any orders for the employment

of the Vessel in any carriage, trade or on a voyage which, in the reasonable

judgement of the Owners, will expose the Vessel, Owners, managers, crew, the

Vessel's insurers, or their re-insurers, to any sanction or prohibition imposed

REF. NR: 4717477

by any State, Supranational or International Governmental Organisation.

(b) If the Vessel is already performing an employment to which such sanction or

prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall be obliged to issue

alternative voyage orders within 48 hours of receipt of Owners' notification  of

their refusal to proceed. If the Charterers do not issue such alternative

voyage orders the Owners may discharge any cargo already loaded at any safe

port prior completion of Charterers' alternative voyage orders or delivery of cargo by the Owners and

Charterers to remain responsible for all additional costs and expenses incurred

in connection with such orders/delivery of cargo. If in compliance with this

Sub-clause (b) anything is done or not done, such shall not be deemed a

deviation.

(c) The Charterers shall indemnify the Owners against any and all claims

whatsoever brought by the owners of the cargo and/or the holders of Bills of

Lading and/or sub-charterers against the Owners by reason of the Owners?

compliance with such alternative voyage orders or delivery of the cargo in

accordance with Sub-clause (b).

- OTHERWISE AS PER  EXECUTED CP OF MV ALLEGRA/SANDOR DD 4TH MAY 2018

END

UNQTE

B RGDS/STAVROS MOUSSOYANNIS

# Time Charter

### GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

(Ref.: 5216HvW)

1 **This Charter Party**, made and concluded in ................ *Bennebroek,* .................... *the 4th* day of *October 2017* ............... 19...

2 Between *Megusta Shipping S.A., Monrovia - Liberia*

3 Owners of the good *Liberian* ........ Steamship/ Motorship *"ALLEGRA" - See Clause 77 & Baltic Questionnaire for vessel's description -* of

4 of ......................................... gross register, and ............................... tons net register; having engines of ................ indicated horse power,

5 and with hull, machinery and equipment in a thoroughly efficient state and classed ...........

6 at ......................... of about ....................... cubic feet bale capacity, and about ......................... tons of 2240 lbs.

7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8 allowing a minimum of fifty tons) on a draft of ................ feet ................ inches on ......................... Summer freeboard inclusive of permanent bunkers,

9 which are of the capacity of about ......................... tons of fuel and capable of steaming, fully laden, under good weather

10 conditions about ................ knots on a consumption of about ................ tons of best Welsh coal best grade fuel oil best grade Diesel oil,

11 now *trading* ...........................................

12 ......................... and *Med Asia Shipping B.V.* .................... Charterers of the City of *Ouderkerk aan de Amstel - The Netherlands*

13 **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 about *one time charter trip of about 25-35 days without guarantee, all going well, weather permitting, unforeseen circumstances*

15 *always excepted in Charterers' option, via good and safe ports/berths/anchorages/places, always via safe passages, safe*

15 *aproaches, and vessel to remain safely afloat at any time of tide, trading always within IWL/INL, with lawful/*

15 *permissible/harmless/non-dangerous merchandise including but not limited to steels/bulk/generals/bagged cargo/forestry*

15 *products/project cargo on deck and/or under deck. -* within below mentioned trading limits.

15 *- Trading area: amongst other countries it is understood that the vessel is able to trade ports and navigable waters from Haldia*

15 *to Djibouti, Red Sea, inclusive of Sri Lanka, always excluding: Yemen, Iran, Iraq, Somalia, Sudan and Syria.*

15 *- Cargo intention: intention is to carry steel billets and other steels/generals/projects on and under deck.*

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17 the fulfilment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligation*

17 *hereunder.*

18 Vessel to be placed at the disposal of the Charterers, at *arrival first seapilot station Haldia - East Coast India at any time day or night/*

19 *Sundays and Holidays included* .........................................

20 in such dock or at such wharf or place (where she may safely lie always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her *arrival first loading port*

21 *delivery to be*

22 ready to receive *any permissible* cargo (*See Clause 49). On delivery and throughout the Charter, vessel to be* with clean swept holds and

22 tight, staunch, strong and in every way fitted for the service, having water ballast, *cranes* winches and

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25 dise, including petroleum or its products in proper containers, excluding *- See Clause 29 -* .........................................

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports *and/or places*. in British

27 North

28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or ........ and/or Europe

29 Mexico, and/or South America ......................................... and/or Europe

30 and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31 October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic.

32 .........................................

33 *Trading Exclusions: See Clause 30.* .........................................

34 .........................................

35 as the Charterers or their Agents shall direct, on the following conditions:

35 *Charterers have the option to breach Institute Warrant Limits against paying additional premium on Hull and Machinery*

35 *according to vouchers from Underwrites showing additional premium net of all rebates. Amount not to exceed the lowest*

35 *premium obtainable on the London Market.*

36 1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38 the vessel in a thoroughly efficient state in hull, *cargo spaces,* machinery and equipment *with all certificates necessary to comply with current*

38 *requirements at ports of call* for and during the service.

39 2. That, *whilst on hire,* the Charterers shall provide and pay for all the fuel *and Marine Gas Oil* except as otherwise agreed. Port Charges, *all*







39  Pilotages, *including compulsory/recommended and those as customarily requested by the Master for safe navigation of the vessel,*
39  Agencies, *(except agency fee directly related to Owners' matters)* Commissions, *boatage on Charterers' business, if any, stevedore*
39  *charges, municipality and state taxes, if any, except those pertaining to vessel's flag, canal tolls, river tolls, tug boats,*
39  *compulsory garbage removal, if any,*
40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. *Pilotage Grena/Spodsbjerg (and vice*
41  *versa), Bosporus Straight and Torres Straight, the Sound and the Little Belt to be for Charterers' account. Gangway watchmen*
41  *requested by Charterers and/or their servants for cargo and all compulsory shore watchmen to be for Charterers' account.*
41  Fumigations ordered because of
42  illness of the crew *or cargoes carried prior to delivery* to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while
42  vessel is employed under this
43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44  of six months or more.
45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners to allow them the use of any dunnage and shifting boards *and any other fittings* already aboard vessel *as available on the* , Charterers to have
46  the privilege of using shifting boards
47  for dunnage, they making good any damage thereto.
48      3.    That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
49  board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ..................... tons and not more than
50  ..................... tons and to be re-delivered with not less than ..................... tons and not more than ..................... tons. *- See Clause 43 -*
51      4.    That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 9,500,-- daily including overtime + lubes*
52  *Charterers to pay the first days hire within 3 banking days of vessel's delivery and on receipt of Owners' invoice by email*
52  *attachement, thereafter every 5 days in advance untill redelivery. First hire to include lumpsum payment of USD 25.000,-- for*
52  *Piracy contribution.* ..................... United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and
53  stores, on ..................... summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at
54  and after the same rate for any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) at *on dropping outward sea pilot station, one safe port Red Sea, intention Djibouti at*
56  *any time day or night/Sundays and Holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less than *15/10/7/5*
56  days *approximate*
57  notice *and 3/2/1 day(s) difinite notice* of vessels expected date of re-delivery, and probable port
58      5.    Payment of said hire to be made *to Owners'bank* in New York in cash in United States Currency *every 5 days* semi-monthly in advance, and
58  for the last *10 days* half month or
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire, or bank guarantee *or deposit*, or on any *fundamental* breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service
61  of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
63  following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
64  to have the privilege of using vessel at once, such time used to count as hire. *- See Clause 63 -*
65      Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances.
68      6.    That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place *or safe anchorage in port or*
68  *elsewhere* that Charterers or their Agents may
69  direct, provided the vessel can safely lie always afloat at any time of tide. *Vessel to trade only always afloat. NAABSA can only be allowed at*
69  *the customary grain ports of Argentina/Brasil and Uruguay.* except at such places where it is customary for similar size vessels to safely
70  lie aground.
71      7.    That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers
74  paying Owners ..................... per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
75  incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense. *No passengers allowed.*
76      8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, *dunnage,* and trim, *tally, lash/re-lash/unlash, secure/re-secure and discharge* the cargo at their *risk*
78  *and* expense under the supervision of the Captain, who is to sign, *or when required by Charterers, authorize the Charterers or their Agents to*
78  *sign* Bills of Lading *on his behalf* for
79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *Tally is shared 50/50.*
80      9.    That if the Charterers shall have *reasonable* reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82      10.    That the Charterers shall have permission to appoint a Supercargo *at their risk/expense,* who shall *sign a Letter of Indemnity and waiver*
82  *in Owners' form on boarding and* accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the
84  rate of $1.00 *USD 12,--* per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc., Charterers *to compensate Owners' lump sum USD 1.250,-- per month pro rata in respect of Charterers'*
85  paying at the current rate per meal, for all such victualling, *communicating and representation*
86      11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the





87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88 terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs, showing the course of the vessel and distance run and the
88 con-
89 sumption of fuel *as well as revolutions of main engine and velocity of and direction of wind and sea, all in English language.*
90     12. That the Captain shall use diligence in caring for the ventilation of the cargo *by means of natural ventilation if and when required by*
90 *written instructions from the Charterers*
91     13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ..................................................................................
92 ..................................................................................................................................................................................
93 ~~on giving written notice thereof to the Owners on their Agents~~ ......................... ~~days previous to the expiration of the first named term, of any declared option.~~
94     14. That if required by Charterers, time not to commence before *00:01 hours on the 9th of October 2017* and should vessel
95 not have given written notice of readiness on or before *23:59 hours on the 11th of October 2017* ~~but not later than 4 p.m.~~ Charterers or
96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97     15. That in the event of the loss of time from deficiency *and/or default and/or strike* of men or *deficiency of* stores, fire, breakdown or damages
97 to hull, machinery or equipment,
98 grounding, detention by average accidents to ship or cargo *unless resulting from inherent vice, quality or defect of the cargo*, drydocking for the
98 purpose of examination or painting bottom, or by any other cause *whatsoever*
99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and *all extra directly related and proven may be*
99 *deducted from the hire and* if upon the voyage the speed is reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all *directly related and proven* extra expenses shall be deducted from the hire. *Notwithstanding above, it cannot be taken as*
101 *off-hire when all above takes place due to fault or responsibility of Charterers and/or their servants.*
102     16. That should the Vessel be lost, money paid in advance and not earned reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105     The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.
107     17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,
108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.
109 - *See further Arbitration Clause 38* -
110     18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114     19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crews' proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116 York-Antwerp Rules *1974 and 1990 and all amendments thereto in London* ~~1924 at such port or place in the United States as may be elected by~~
116 ~~the carrier,~~ and as to matters not provided for by these
117 Rules, according to the laws and usages at the port of *London.* ~~New York.~~ In such adjustment disbursements in foreign currencies shall be exchanged into
118 United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119 the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120 bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121 or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122 required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123 carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
124 place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125 United States money. *Charter hire not to contribute to General Average.*
126     ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~
132     ~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.~~
133     20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
134 cost of replacing same, to be allowed by Owners.
135     21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 - *See Clause 79* -.
139 ..................................................................................................................................................................................
140     22. Owners shall maintain the gear of the ship as fitted, providing gear for all *cranes* ~~derricks~~ capable of handling lifts up to *their S.W.L., in*
140 *accordance with the description Clause 77* ~~three tons, also~~
141 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *power and electric light on deck*
142 *and in cargo holds sufficient for night work in all holds simultaneously in accordance with its designed capacity.* ~~lanterns and oil~~
142 ~~for~~
143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The
144 Charterers to have the use of any gear on board the vessel.





145    23.  Vessel to work night and day, if required by Charterers *all cranes drivers are to be employed at Charterers' risk,* and all *cranes*
145    ~~winches~~ to be at Charterers' disposal during loading and discharging; *Shore cranemen to be employed and paid by Charterers. Stevedores to be*
145    *considered as Charterers' servants,* ~~steamer to provide one winchman per hatch to work, winches day and night as required. Charterers agreeing to pay officers, engineers, winchmen,~~
146    ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
147    ~~port, or labor unions, prevent crew from driving winches,~~ shore *cranemen* Winchmen to be paid by Charterers. In the event of a disabled *crane* ~~winch or~~
148    *cranes* ~~winches, or~~
148    insufficient power to operate *crane or cranes* ~~winches,~~ the vessel to be considered to be off-hire pro rata per hold effected to the extent
149    *that time as actually lost to the Charterers and Owners to pay any directly related extra expenses including stevedores standby*
149    *charges occasioned thereby but limited only to the shift affected. If required by the Charterers and provided that Owners have*
149    *been unable to timely rectify/repair the deficient crane(s), or power to drive same, the Owners are to bear the cost of hiring*
149    *shore gear in lieu of cranes in which case the vessel to remain on hire provided that the shore gear performs as per vessel's*
149    *cranes. Otherwise vessel to be pro rata off-hire. It is understood that Owners are not to be responsible for any stevedore standby*
149    *time ordered against already disabled gear, (however, Owners are to pay for the balance of the shift on which the breakdown*
149    *occurred until the said gear has resumed its workability), unless Master has given Notice of Readiness of gear, pro rata off-hire*
149    *to cease upon commencement of first stevedore shift after the gear has become workable or Owners have arranged shoreside*
149    *gear.* ~~Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150    ~~thereby.~~ *Unless such disablement of insufficiency of power is caused by the Charterers' stevedores. Any time lost due to winch*
150    *breakdown and/or insufficient power to be deducted pro rata to number of gangs affected.*
151    24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152    in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;
153    etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to *General Clause Paramount* ~~the~~
153    ~~following clause, both~~
154    of which are to be included in all bills of lading issued hereunder. *- See Clause 62 -*
155    ~~U. S. A. Clause Paramount~~
156    ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157    ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158    ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159    ~~be repugnant to said Act to any extent such term shall be void to that extent, but no further.~~
160    ~~Both to Blame Collision Clause~~
161    ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162    ~~Master, mariner, pilot or the servant of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163    ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164    ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165    ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166    ~~owners as part of their claim against the carrying ship or carrier.~~
167    25.  The vessel is *not ice-classed and* shall not be required to enter *ice,* any ice-bound port/*place,* or any port/*place* where lights or light-ships have
168    been or are about to be with-
168    drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169    port/*place* or to get out after having completed loading or discharging. *Vessel not obliged to force ice nor follow icebreakers. If on account of*
169    *ice, the Master considers it dangerous to remain at the loading- or discharging place for fear of the vessel being frozen in and/or*
169    *or damaged, he has the liberty to sail to a convenient open place and wait Charterers' fresh instructions. Detention and/or*
169    *damages through any of the above causes and/or through ice damage to be for Charterers' account.*
170    26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171    navigation of the vessel, insurance, crew, *acts of pilots and tugboats* and all other matters, same as when trading for their own account.
172    27.  A commission of 2-1/2 *1,25* per cent is payable by the Vessel and Owners to
173    *Victory Shipping and Agency B.V., Bennebroek - The Netherlands + 1,25 per cent to Eastmed Inc.*
174    on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter
175    28.  An address commission of 2-1/2 *3,75* per cent payable to *Charterers* ................................................. on the hire earned and paid under this Charter
175
175    *Clauses 29 through to 84 are to be fully incorporated in this charter party. The rider Clauses' headings are for easy reference*
175    *only and not part of this charter party.*
175
175
175                                  *The Owners:*                          *The Charterers:*
175
175                                                                    *For and on behalf of*
175                                                                    MED ASIA SHIPPING B.V. AMSTERDAM

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.) Inc., using software which is the copyright of SDSD. It is a precise copy of the original document which can be amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being either specified, underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

# EXHIBIT 2

## MATE'S RECEIPT

01

THIS IS TO CERTIFY THAT I THE UNDERSIGNED, RECEIVED ON BOARD M.V. "EVOLUTION" FROM MESSRS DUBRAL
INDUSTRIES AT BANDAR ABBAS, IRAN, THE GOODS DESCRIBED BELOW, DESTINED TO SURABAYA, INDONESIA.

| | |
|---|---|
| SHIPPER | DUBRAL INDUSTRIES<br>NO.209, 2ND FLOOR, ARMINEH TOWER<br>KHORDIN BULAVAR, SHAHRAK GHARB, TEHRAN, IRAN |
| CONSIGNEE | CGT MIDDLE EAST, P. O. BOX 41985, DUBAI, UAE. |
| NOTIFY | CGT MIDDLE EAST, P. O. BOX 41985, DUBAI, UAE. |
| DESCRIPTION | DIRECT REDUCED IRON (DRI) |
| LOADING PORT | BANDAR ABBAS PORT, IRAN |
| DISCHARGE PORT | SURABAYA, INDONESIA |
| QUANTITY | TOTAL QUANTITY: 4, 991.02 MT |
| REMARKS | FREIGHT PAYABLE AS PER CHARTER PARTY<br>CLEAN, SHIPPED ON BOARD DATED 28.06.2018 |
| DATED | 28.06.2018 |

MASTER OF "MV EVOLUTION"
CAPT. TSOUDIS, ANIS

## MATE'S RECEIPT

03

THIS IS TO CERTIFY THAT I THE UNDERSIGNED, RECEIVED ON BOARD M.V. "EVOLUTION" FROM MESSRS PENSION FUND TRADING COMPANY AT BANDAR ABBAS, IRAN, THE GOODS DESCRIBED BELOW, DESTINED TO SURABAYA, INDONESIA.

SHIPPER                      PENSION FUND TRADING COMPANY

CONSIGNEE                    CGT MIDDLE EAST, P. O. BOX 41985, DUBAI, UAE.

NOTIFY                       CGT MIDDLE EAST, P. O. BOX 41985, DUBAI, UAE.

DESCRIPTION                  DIRECT REDUCED IRON (DRI)

LOADING PORT                 BANDAR ABBAS PORT, IRAN

DISCHARGE PORT               SURABAYA, INDONESIA

QUANTITY                     TOTAL QUANTITY: 4,959.94 MT

REMARKS                      FREIGHT PAYABLE AS PER CHARTER PARTY
                             CLEAN, SHIPPED ON BOARD DATED 28.06.2018

DATED                        28.06.2018

MASTER OF "MV EVOLUTION"
CAPT. TSOUDIS, ARIS

# MATE'S RECEIPT

02

THIS IS TO CERTIFY THAT I THE UNDERSIGNED, RECEIVED ON BOARD M.V. "EVOLUTION" FROM MESSRS PARS DIBA BONYAN CO. AT BANDAR ABBAS, IRAN, THE GOODS DESCRIBED BELOW, DESTINED TO SURABAYA, INDONESIA.

| | |
|---|---|
| SHIPPER | PARS DIBA BONYAN CO.<br>TEHRAN, IRAN |
| CONSIGNEE | CGT MIDDLE EAST, P. O. BOX 41985, DUBAI, UAE. |
| NOTIFY | CGT MIDDLE EAST, P. O. BOX 41985, DUBAI, UAE. |
| DESCRIPTION | DIRECT REDUCED IRON (DRI) |
| LOADING PORT | BANDAR ABBAS PORT, IRAN |
| DISCHARGE PORT | SURABAYA, INDONESIA |
| QUANTITY | TOTAL QUANTITY: 6,144.588  MT |
| REMARKS | FREIGHT PAYABLE AS PER CHARTER PARTY<br>CLEAN, SHIPPED ON BOARD DATED 28.06.2018 |
| DATED | 28.06.2018 |

MASTER OF "MV EVOLUTION"
CAPT. TSOUDIS/ARIS

# EXHIBIT 3

CODE NAME. "CONGENBILL" EDITION 1994

B/L NO. 01

**BILL OF LADING**
TO BE USED WITH CHARTER-PARTIES

Shipper

**DUBRAL INDUSTRIES**
**NO.209, 2ND FLOOR, ARMINEH TOWER**
**KHORDIN BULAVAR, SHAHRAK GHARB, TEHRAN, IRAN**

Reference No

Consignee

**CGT MIDDLE EAST, P. O. BOX 41985, DUBAI, UAE.**

Notify address

**CGT MIDDLE EAST, P. O. BOX 41985, DUBAI, UAE.**

COPY

NON - NEGOTIABLE

Vessel

**MV "EVOLUTION"**

Port of loading

**BANDAR ABBAS - IRAN**

Port of discharge

**SURABAYA, INDONESIA**

Shipper's description of goods

**DIRECT REDUCED IRON (DRI)**

Gross weight

**TOTAL QUANTITY: 4, 991.02 MT**

**FREIGHT PAYABLE AS PER CHARTER PARTY**
**CLEAN, SHIPPED ON BOARD DATED 28.06.2018**

(Of which    NIL    on deck at shipper's risk, the carrier not being responsible for loss or damage howsoever arising)

| | |
|---|---|
| Freight payable as per<br>CHARTER-PARTY dated  05 05 2018 | S H I P P E D at the Port of Loading In apparent good order and condition on board the vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above. |
| Received on account of freight: | Weight, measure, quality, quantity, condition, contents and value unknown |
| | IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading Indicated below all of this tenor and date, any one of which being accomplished the others shall be void. |
| Time used for loading          Days          hours | FOR CONDITIONS OF CARRIAGE SEE OVERLEAF |

| | | |
|---|---|---|
| Printed and sold by<br>Fr.G.Knudtzons Bogtrykkeri A/S,55 Toldbodgade,DK-1253<br>Copenhagen K,<br>Telefax +45 33 93 11 84<br>By authority of The Baltic and International Maritime<br>Council<br>(BIMCO), Copenhagen | Freight payable at<br><br>**AS PER C/P** | Place and date of Issue<br>**BANDAR ABBAS**<br>**28.06 .2018** |
| | Number of original Bs/L<br><br>**3/3** | Signature<br>**SILVERLINE SHIPPING AGENCY AS AGENT**<br>**ONLY FOR AND BEHALF OF MASTER OF**<br>**MV "EVOLUTION"**<br>**CAPT. TSGOUISTARIS** |

Page 1

# BILL OF LADING
TO BE USED WITH CHARTER-PARTIES
CODE NAME: "CONGENBILL"
EDITION 1994

ADOPTED BY
THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)

## Conditions of Carriage.

(1) All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are Here with Incorporated.

(2) General Paramount Clause
(a) The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment shall apply to this Bill of Lading. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

(b) Trades where Hague-Visby Rules apply
In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 - the Hague-Visby Rules - apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.

(c) The Carrier shall in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier, nor in respect of deck cargo or live animals.

(3) General Average

General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof, in London unless another place is agreed in the Charter.
Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part II, Art. 148.

(4) New Jason Clause

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Carrier before delivery.

(5) Both-to-Blame Collision Clause

If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by their other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier.
The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

For particulars of cargo, freight, destination, etc., see overleaf.

CODE NAME "CONGENBILL" EDITION 1994

B/L NO' 02

**BILL OF LADING**
TO BE USED WITH CHARTER-PARTIES

Reference No

Shipper

PARS DIBA BONYAN CO.
TEHRAN, IRAN

Consignee

CGT MIDDLE EAST, P. O. BOX 41985, DUBAI, UAE.

Notify address

CGT MIDDLE EAST, P. O. BOX 41985, DUBAI, UAE.

**COPY**

**NON - NEGOTIABLE**

Vessel

MV "EVOLUTION"

Port of loading

BANDAR ABBAS - IRAN

Port of discharge

SURABAYA, INDONESIA

Shipper's description of goods

DIRECT REDUCED IRON (DRI)

Gross weight

**TOTAL QUANTITY: 5,144.688 MT**

FREIGHT PAYABLE AS PER CHARTER PARTY
CLEAN, SHIPPED ON BOARD DATED 28.06.2018

(Of which    NIL    on deck at shipper's risk  the carrier not being responsible for loss or damage howsoever arising)

| Freight payable as per CHARTER-PARTY dated  05 05 2018 | S H I P P E D at the Port of Loading in apparent good order and condition on board the vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above |
|---|---|
| Received on account of freight | Weight  measure  quality  quantity  condition  contents and value unknown |
|  | IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date any one of which being accomplished the others shall be void |
| Time used for loading  .    Days    hours | FOR CONDITIONS OF CARRIAGE SEE OVERLEAF |

| Printed and sold by Fr G Knudtzons Bogtrykker, A/S 55 Toldbudgade DK 1253 Copenhagen K, Telefax +45 33 93 11 84 By authority of The Baltic and International Maritime Council (BIMCO, Copenhagen | Freight payable at AS PER C/P Number of original Bs/L 3/3 | Place and date of Issue BANDAR ABBAS 28.06 .2018 Signature SILVERLINE SHIPPING AGENCY AS AGENT ONLY FOR AND BEHALF OF MASTER OF MV "EVOLUTION" CAPT. TSOUDIS ARIS |

CODE NAME "CONGENBILL" EDITION 1994

B/L NO: 03

**BILL OF LADING**
TO BE USED WITH CHARTER-PARTIES

Shipper

PENSION FUND TRADING COMPANY

Reference No

Consignee

CGT MIDDLE EAST, P. O. BOX 41985, DUBAI, UAE.

Notify address

CGT MIDDLE EAST, P. O. BOX 41985, DUBAI, UAE.

COPY

NON - NEGOTIABLE

| Vessel | Port of loading |
|---|---|
| MV "EVOLUTION" | BANDAR ABBAS - IRAN |

Port of discharge

SURABAYA, INDONESIA

| Shipper's description of goods | Gross weight |
|---|---|
| DIRECT REDUCED IRON (DRI) | TOTAL QUANTITY: 4,959.94 MT |

FREIGHT PAYABLE AS PER CHARTER PARTY
CLEAN, SHIPPED ON BOARD DATED 28.06.2018

(Of which     NIL     on deck at shipper's risk, the carrier not being responsible for loss or damage howsoever arising)

| | |
|---|---|
| Freight payable as per CHARTER-PARTY dated  05.05 2018 | S H I P P E D at the Port of Loading In apparent good order and condition on board the vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above. |
| Received on account of freight | Weight, measure, quality, quantity, condition, contents and value unknown. |
| Time used for loading     Days     hours. | IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void. |
| | FOR CONDITIONS OF CARRIAGE SEE OVERLEAF |

| Printed and sold by | Freight payable at | Place and date of issue |
|---|---|---|
| Fr G Knudtzons Bogtrykkeri A/S,55 Toldbodgade,DK-1253 Copenhagen K. Telefax +45 33 93 11 84 By authority of The Baltic and International Maritime Council (BIMCO), Copenhagen. | AS PER C/P | BANDAR ABBAS 28.06 .2018 |
| | Number of original Bs/L | Signature |
| | 3/3 | SILVERLINE SHIPPING AGENCY AS AGENT ONLY FOR AND BEHALF OF MASTER OF MV "EVOLUTION" CAPT. ISOUDIS ARIS |

Page 1

# BILL OF LADING
**TO BE USED WITH CHARTER-PARTIES**
**CODE NAME: "CONGENBILL"**
**EDITION 1994**

ADOPTED BY
THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)

## Conditions of Carriage.

**(1)** All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are Here with Incorporated.

**(2)** General Paramount Clause.

*(a)* The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment shall apply to this Bill of Lading. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply

*(b)* Trades where Hague-Visby Rules apply.
In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 - the Hague-Visby Rules - apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.

*(c)* The Carrier shall in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier, nor in respect of deck cargo or live animals.

**(3)** General Average.

General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof, in London unless another place is agreed in the Charter.
Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part II, Art. 148.

**(4)** New Jason Clause.

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Carrier before delivery.

**(5)** Both-to-Blame Collision Clause.

If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by their other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier.
The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

For particulars of cargo, freight, destination, etc., see overleaf.

# EXHIBIT 4

| 1. Shipbroker | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)<br>INCLUDING " F.I.O." ALTERNATIVE, ETC.<br>(To be used for trades for which no specially approved form is in force)<br>CODE NAME: " G E N C O N " |
|---|---|
| ComChart Hamburg GmbH<br>Rosengarten, Germany<br>Email: chartering@comchart.de | Part I |
| | 2. Place and date<br>Rosengarten, 5th May 2018 |
| 3. Owners / Place of business (Cl. 1)<br>Messrs<br>Sandor Shipping OU<br>Estonia<br>As disponent Owners | 4. Charterers / Place of business (Cl. 1)<br>Messrs<br>Interfer Steel and Commodities FZE<br>Dubai, U.A.E. |
| 5. Vessel's name (Cl. 1) – see Clause 37<br>M/V 'Evolution' – see Clause 37 | 6. GT / NT (Cl. 1) |
| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1) | 8. Present position (Cl. 1)<br>trading |
| 9. Expected ready to load (abt.) (Cl. 1)<br>23rd June 2018 | |
| 10. Loading port or place (Cl. 1)<br>1 safe berth Bandar Abbas | 11. Discharging port or place (Cl. 1)<br>1 safe berth Surabaya |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state " part cargo") (Cl. 1)<br><br>Minimum 15.000 mtons 10% more in Charterers option bulk D.R.I. (Grade B) | |
| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 1)<br><br>See Clause 47 | 14. Freight payment ( state currency and method of payment , also beneficiary and bank account ) (Cl. 4)<br><br>See Clause 20 |
| 15. State if vessel's cargo handling gear not be used Cl. 5;<br>See Clause 34 | 16. Laytime ( if separate laytime for load. and disch. is agreed, fill in a) and b) . . If total laytime for load and disch , fill in c) only) ( Cl. 6 ) |
| 17. Shippers / Place of business (Cl. 6) | a) Laytime for loading<br>see Clause 21 |
| 18. Agents ( loading ) ( Cl. 6 )<br>See Clause 38 | b) Laytime for discharging<br>See Clause 21 |
| 19. Agents ( discharging ) ( Cl. 6 )<br>See Clause 38 | c) Total laytime for loading and discharging |
| 20. Demurrage rate and manner payable ( loading and discharging ) ( Cl. 7 )<br><br>See Clause 33 | 21. Cancelling date (Cl. 9 )<br>24th June 2018 |
| | 22. General Average to be adjusted at ( Cl. 12 )<br>London |
| 23. Freight Tax ( state if for the Owners' account) ( Cl. 13 ( c );<br>See Clause 28 | 24. Brokerage commission and to whom payable ( Cl. 15 )<br>2,5% on freight, deadfreight and demurrage is payable to<br>Messrs ComChart Hamburg GmbH for division with others<br>as agreed |
| 25. Law and Arbitration ( state 19 (a). 19 ( b) or 19 ( c ) of Cl. 19; if 19 ( c) agreed also state Place of Arbitration)( if not filled in 19 (a) shall apply )( Cl. 19)<br>as per Clause 19 (a) | 26. Additional clauses covering special provisions, if agreed<br>Clauses 20 to 50, as attached, are deemed incorporated<br>into this C/P |
| (a) State maximum amount for small claims/ shortand arbitration (Cl. 19)<br>US$ 50.000,00 | |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions the provisions of Part I shall prevail over those of Part II to the extent of such conflict

| Signature (Owners) | Signature (Charterers)<br>For and on behalf of Charterers<br>As agents only<br>ComChart Hamburg GmbH |
|---|---|

**PART II**
**GENCON 1994 Uniform General Charter**

1.      It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party ~~about~~ on the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that: The said Vessel shall, ~~as soon as her prior commitments have been completed,~~ proceed to the loading port(s) or place(s) stated in Box 10 ~~or so near thereto as she may safely get~~ and lie always afloat, and there load under deck a ~~full and complete~~ cargo ~~(if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility)~~ as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, ~~or so near thereto as she may safely get~~ and lie always afloat, and there deliver the cargo.

2.      **Owners' Responsibility Clause**

The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager. ~~And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.~~ Master to supervise stow stowage.

3.      **Deviation Clause**

The Vessel has liberty to call at any port or ports en route in connection with this voyage ~~in any order, for any purpose,~~ to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4.      **Payment of Freight** See Clause 20

(a)      ~~The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.~~

(b)      ~~Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost. Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.~~

(c)      ~~On delivery. If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally. Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.~~

5.      **Loading/Discharging** see Clauses 21 + 22 + 34

(a)      **Costs/Risks**

The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.

Copyright © 1994 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this document will constitute an infringement of BIMCO's copyright. As revised 1922, 1976 and 1994. Explanatory notes are available from BIMCO at www.bimco.org.

**PART II**
**GENCON 1994 Uniform General Charter**

**(b)**   ~~Cargo Handling Gear~~

~~Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power – pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party – shall not count as laytime or time on demurrage. On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.~~

**(c)**   Stevedore Damage see Clause 29

~~The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability. The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.~~

**6.**   **Laytime** see Clauses 21 + 24

**(a)***   ~~Separate laytime for loading and discharging~~

~~The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count. The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~

~~(b)*   Total laytime for loading and discharging~~

~~The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~

**(c)**   Commencement of laytime (loading and discharging)

Laytime for loading and discharging shall commence at 1~~3~~4.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 0~~6~~8.00 hours next working day if notice given during office hours after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.

If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/ discharging berth shall not count as laytime even if the vessel is already on demurrage. If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime. Time used before commencement of laytime shall count.

~~*Indicate alternative (a) or (b) as agreed, in Box 16.~~

Copyright © 1994 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this document will constitute an infringement of BIMCO's copyright. As revised 1922, 1976 and 1994. Explanatory notes are available from BIMCO at www.bimco.org.

**PART II**
**GENCON 1994 Uniform General Charter**

**7.** **Demurrage** <u>see Clause 33</u>

~~Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice. In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.~~

**8.** **Lien Clause**

The Owners shall have a lien on the cargo ~~and on all sub-freights payable in respect of the cargo~~, for freight, deadfreight, demurrage <u>and detention</u>, ~~claims for damages and for all other amounts due under this Charter Party including costs of recovering same.~~

**9.** **Cancelling Clause**

(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party. <u>Such option to be declared by Charterers latest within 2 working days after Owners have requested for a new cancelling date.</u>

(b) ~~Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date. Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date. The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.~~

**10.** **Bills of Lading** <u>see Clauses 26 + 27</u>

~~Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the Owners' agents provided written authority has been given by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party.~~

**11.** **Both-to-Blame Collision Clause**

If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

**12.** **General Average and New Jason Clause**

General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general

Copyright © 1994 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this document will constitute an infringement of BIMCO's copyright. As revised 1922, 1976 and 1994. Explanatory notes are available from BIMCO at www.bimco.org.

**PART II**
**GENCON 1994 Uniform General Charter**

expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2). If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery."

13. **Taxes and Dues Clause** see Clause 28

(a) On Vessel - The Owners shall pay all dues, charges and taxes customarily levied on the Vessel, howsoever the amount thereof may be assessed.

(b) On cargo - The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed.

(c) On freight - Unless otherwise agreed in Box 23, taxes levied on the freight shall be for the Charterers' account.

14. **Agency** see Clause 39

In every case the Owners shall appoint their own Agent both at the port of loading and the port of discharge.

15. **Brokerage**

A brokerage commission at the rate stated in Box 24 on the freight, dead-freight and demurrage earned is due to the party mentioned in Box 24. In case of non-execution 1/3 of the brokerage on the estimated amount of freight to be paid by the party responsible for such non-execution to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be agreed.

16. **General Strike Clause**

(a) If there is a strike or lock-out affecting or preventing the actual loading of the cargo, or any part of it, when the Vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, the Master or the Owners may ask the Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless the Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, the Owners shall have the option of cancelling this Charter Party. If part cargo has already been loaded, the Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.

(b) If there is a strike or lock-out affecting or preventing the actual discharging of the cargo on or after the Vessel's arrival at or off port of discharge and same has not been settled within 48 hours, the Charterers shall have the option of keeping the Vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging until the strike or lock-out terminates and thereafter full demurrage shall be payable until the completion of discharging, or of ordering the Vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party and of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance to the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

Copyright © 1994 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this document will constitute an infringement of BIMCO's copyright. As revised 1922, 1976 and 1994. Explanatory notes are available from BIMCO at www.bimco.org.

PART II
**GENCON 1994 Uniform General Charter**

(c)      Except for the obligations described above, neither the Charterers nor the Owners shall be responsible for the consequences of any strikes or lock-outs preventing or affecting the actual loading or discharging of the cargo.

**17.**     ~~War Risks ("Voywar 1993")~~ "Voywar 2004 as amended" to apply

(a)     ~~For the purpose of this Clause, the words:~~

~~(i) The "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and~~

~~(ii) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.~~

~~(b) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.~~

~~(c) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.~~

~~(d) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.~~

~~(e) The Vessel shall have liberty:-~~

Copyright © 1994 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this document will constitute an infringement of BIMCO's copyright. As revised 1922, 1976 and 1994. Explanatory notes are available from BIMCO at www.bimco.org.

PART II
GENCON 1994 Uniform General Charter

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

(ii) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

(vi) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(f) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

**18.    General Ice Clause**

Port of loading

(a)    In the event of the loading port being inaccessible by reason of ice when the Vessel is ready to proceed from her last port or at any time during the voyage or on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without cargo, and this Charter Party shall be null and void.

(b)    If during loading the Master, for fear of the Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for the Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination at the Vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Charterers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per this Charter Party.

(c)    In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or the Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the Charter Party null and void unless the Charterers agree to load full cargo at the open port.

Port of discharge

(a)    Should ice prevent the Vessel from reaching port of discharge the Charterers shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying demurrage or of ordering the Vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the impossibility of reaching port of destination.

Copyright © 1994 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this document will constitute an infringement of BIMCO's copyright. As revised 1922, 1976 and 1994. Explanatory notes are available from BIMCO at www.bimco.org.

**PART II**
**GENCON 1994 Uniform General Charter**

(b) ~~If during discharging, the Master for fear of the Vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge.~~

(c) ~~On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.~~

19.    **Law and Arbitration**

(a)*    This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall be final. For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.

(b)*    ~~This Charter Party shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc. For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc.~~

(c)*    ~~Any dispute arising out of this Charter Party shall be referred to arbitration at the place indicated in Box 25, subject to the procedures applicable there. The laws of the place indicated in Box 25 shall govern this Charter Party.~~

(d)    ~~If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply.~~

    * (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.

    ** Where no figure is supplied in Box 25 in Part I, this provision only shall be void but the other provisions of this Clause shall have full force and remain in effect.

Copyright © 1994 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this document will constitute an infringement of BIMCO's copyright. As revised 1922, 1976 and 1994. Explanatory notes are available from BIMCO at www.bimco.org.



**ADDITIONALCLAUSES TO THE CHARTER PARTY**
**M/V "EVOLUTION" / INTERFER STEEL AND COMMODITIES FZE, DUBAI**
**DATED HAMBURG 5th May 2018**

### Clause 20 - Freight Payment

Freight shall be payable in Hamburg as follows:
100% freight less commission is payable in US-Dollars to Owners nominated bank account within three banking days after completion of loading and/or signing/releasing 'clean on board' Bills of Lading unless Bills of Lading are claused "freight payable as per Charter Party" which case Bills of Lading to be released immediately after loading.
Charterers have the option to have Bs/l marked 'freight prepaid' in which case freight shall still be paid 3 banking days after signing 'clean on board' and/or 'freight prepaid' bills of lading but bills of lading shall only be released after owners have received charterers or their agents bankers written confirmation of irrevocable freight transfer (Swift MT103) as per cp.
Full freight deemed earned on cargo already loaded on board and shall be due discountless and non-returnable, ship and/or cargo lost or not lost.
Freight is paid in USD to Owners nominated account. Only invoice number will be indicated on the payment swift. No vessel name or voyage Number.

### Clause 21 – Loading/Discharging

The master shall furnish the stevedores with an adequate stowage plan on vessel's arrival. If load port rules require vessel to send stowage plan in advance then vessel to comply.
The cargo to be loaded, stowed and lashed, secured and trimmed to the satisfaction of Master by the Shippers stevedores free of expense to the vessel, under deck only, in the ship's main cargo compartments basis 4.000 mtons per weather working day of 24 consecutive hours Fridays, Saturdays, Sundays and holidays included. Owners guarantee ship's crane in good working order for loading and discharging cargo, otherwise shore crane to be for owner's account and arrangement. Loading rate is based on min 3 simultaneously workable sufficiently geared hatches. Notice of readiness to be tendered/accepted Shinc.

The cargo to be discharged basis 8.000 mtons per weather working day of 24 consecutive hours Sun- and holidays included at Surabaya.
Notice of readiness to be tendered/accepted within office hours Sunday through Thursday 0900 hrs to 1800 hrs w/w/w/w and Gencon time counting 2pm / 8 am.

### Clause 22 – Partcargo

No other cargo allowed on this voyage, except en-route deck cargo, if any.

1



### Clause 23 – Overtime

Charterers/Shippers/Receivers shall have the liberty to work during any excepted periods and Master to allow work to be done.
Overtime, if any, to be for account of the party ordering same, including equipment costs, if any, but Officers and crews' overtime shall always be for Owners account. If overtime is ordered by the Port Authorities then the costs shall be for Charterers account.

### Clause 24 – Acceptance of Vessel

Vessel deemed to be an arrived ship after tendering notice of readiness and the ships holds are clean, dry and suitable to receive Charterers cargo. The Notice of Readiness may be tendered/accepted in writing or by telex/cable ATDN SSHINC/SSHINC both ends after vessel's arrival at Port limits W.W.W.W , The vessel's holds must be clean swept and dry.

Time used on Vessel's inspection / Piping to count as laytime.
Piping will be done while the Vessel is on anchorage, vessel to be brought alongside for loading immediately after piping is completed.
The loading operation should start immediately after vessel is alongside the berth.
During the loading the Supercargo will place the Thermocouples and once the loading is finished each hold will be sealed by tape and foam.
The Nitrogen purging will start right after that until the $O^2$ level reaches less than 1%.
Spare ISO tank and vaporizer will be placed on Board the vessel.
Laytime will stop counting after all above mentioned has been finished.
Once on demurrage – always on demurrage.

### Clause 25 – Operation of Hatches

Opening and closing of hatches and rigging of cargo gear shall always be done in Owners time and for Owners account. In case the loading/discharging operations cannot commence because hatches are not open time not to count. Hatch covers and any other equipment to be stowed in such a way that it does not interfere with loading/discharging operations.

### Clause 26 – Bills of Lading

Master shall only sign mate's receipt at the loading port.
Bs/l to be signed/released by ComChart in Hamburg or in charts option by agents at loading port, after bills of lading have been approved by Owners. Such procedure to be free of charge for the Owners.

Bills of lading may show different shippers/consignee/notify than what is stated in the mates receipt. This is a requirement under Charterers commercial contracts.
Charterers have the option that loading port in Bs/l will show as 'Jebel Ali' against LOI.
Charterers have the option to have a non-negotiable copy B/L issued by agents at the loading port for custom purposes.
Once a lot is completely loaded, Charterers have the option that owners will authorize issuance of Bs/l for that respective lot.



For all the above Charterers to surrender letter of indemnity in owners' P and I Club wording signed by an authorized person

All cargo to be loaded.
For any remarks in the mates receipt, owners to accept a letter of indemnity as per Owners' s P and I Club wording for issuing 'clean onboard' bills of lading signed by charterers authorized person only. Charterers confirm that all cargo is newly produced.

In case of any claims at discharge port in respect of the cargo conditions specified by the master's remark and covered by the letter of indemnity same to be settled directly between charterers/shippers/receivers without owners involvement and detaining/arresting of the vessel otherwise the charterers should pay detention at the demurrage rate for each day of detention or pro rata.

Cargo may be split into several Bs/l from one M/R against relevant Letter of Indemnity in Owners' P and I Club wording duly signed/stamped by Charterers. Owners will make remarks on M/R covering all cargo.
Congen bills of lading to be issued. Bills of lading to be signed 'for and on behalf of the master, Capt. ....' and then the name of the signing party.

Charterers have the option to have a non-negotiable copy B/L issued by agents at the loading port for custom purposes after Owners' prior approval of its draft.

### Clause 27 – Non availability of Original Bills of Lading

In case original bills of lading are not available on vessel's arrival at discharging port then owners to discharge the cargo into agent's custody without presentation of the original bills of lading provided same is allowed by local port regulations against LOI in the Owners P&I Club wording signed by the Charterers authorized person , otherwise vessel to remain at anchorage and detention at demurrage rate to apply which is payable BBB.
If requested by Charterers owners to deliver the cargo to receivers against letter of indemnity (Owners standard P & I club wording) clearly identifying receivers of the cargo signed by an authorized person of Charterers only or in charterers option against a bank guarantee from receivers as per standard practice in the discharging port.
In any case, detention/demurrage is payable immediately when accumulated to USD 40.000,--

### Clause 28 – Taxes and Dues

Any taxes/dues on cargo to be for Charterers account.
Any taxes/dues on vessel/freight incl evtl wharfage/berthage dues which although calculated on cargo intaken to be for Owners account.

3



### Clause 29 – Stevedore Damages

Stevedores, although appointed and paid for by Shippers/Charterers/Receivers are to be considered Owners servants and shall load, stow and discharge the cargo in accordance with Master's instruction, direction, supervision and control.
Master to remain responsible for proper stowage. Stevedore damages, if any, to be settled directly between Owners and stevedores. If required, Charterers to assist with all their influence to settlement. Master to notify stevedores/agents/Shippers/Receivers of damages, if any, in writing within 24 hours after occurrence, otherwise stevedores cannot be held liable.

### Clause 30 – Use of Forklifts

Shippers/Charterers/Receivers to have the option to use forklifts during loading/discharging operations and Owners to allow the use of forklifts in all compartments and warrant that the vessel is in every respect suitable to allow forklift operations subject to tank top strength.

Stevedores shall endeavor to use forklifts with rubber wheels

### Clause 31 – Overruling

Charter Party terms shall always supersede Bill of Lading terms, whenever contradictory. Typewritten clauses or amendments shall principally overrule the printed text of the Gencon Charter Party.

Transhipment of the cargo is strictly prohibited.

Owners do not have the option to re-let this cargo.

### Clause 32 – Notices

Master/Owners to give daily eta notice to agents at loading respectively discharging port as well as to Charterers via brokers email: chartering@comchart.de.

### Clause 33 – Demurrage/Detention

Demurrage USD 13.500 pdpr / hd wts both ends

4



### Clause 34 – Vessels' Gear

Throughout the duration of this charter-party owners shall always give free use of all vessels cargo gear, winches and / or motive power for loading and/or discharging to operate all cargo handling gear simultaneously at all times, if requested by shippers/receivers/charterers. Vessel's cargo gear, winches and all other equipment shall be in good working order and comply with regulations and / or requirements in effect at port(s) of call and canals and countries in which the vessel will be employed, and to be in class.
Vessel shall at all times be in possession of all required certificates, which must be valid and up-to-date and on board the vessel. Laytime or time on demurrage affected by breakdown of Vessel's gear, winches and/ or motive power shall count only pro rata to number of workable hatches until resumption of workability, and all cost including but not limited to standby/detention expenses and/or extra charges on board and ashore, related to stevedores and terminal operations, caused by breakdown are for Owners' account. If shippers/ receivers/ charterers deem it necessary, non-working gear to be replaced by shore / floating crane same to be arranged and paid for by owners, in which case time will count upon resumption of loading / discharging in full or pro-rata, as the case may be.
Should loading/discharging of the holds/hatches affected by gear breakdown delay beyond the time used for the holds/hatches not affected then laytime shall only count pro rata to the number of holds/hatches previously affected by gear breakdown and now actually worked, even if the vessel is already on demurrage.

### Clauses 35 – Extra insurance

Overage premium on account of vessel's age upto 25 years to be for Charterers account.

War risk insurance, if any, to be for owners account.

### Clause 36 – DRI B Clause

CARGO DESCRIPTION: CHARTERERS ARE PERMITTED TO LOAD A CARGO OF
" DIRECT REDUCED IRON B " (GROUP B , CLASS MHB -  COLD
MOULDED  BRIQUETTES ,

PELLETS, LUMPS) ALWAYS IN ACCORDANCE TO THE REQUIREMENTS IMSBC CODE 2016 EDITION PAGES 171-174 INCLUSIVE (SEE ATTACHMENT).

- OWNERS SHALL HAVE THE LIBERTY OF APPOINTING THEIR CARGO SPECIALIST SURVEYOR (MIL) AND/OR THEIR PNI SUREVEYOR TO CONDUCT A THOROUGH SURVEY OF THE CARGO PRIOR TO LOADING AND BE PRESENT DURING LOADING AND/OR DURING THE VOYAGE IF NECESARRY IN ORDER TO ENSURE THAT THE CARGO IS LOADED/STOWED AND CARRIED IN ACCORDANCE TO THE IMSBC CODE/IMO REGULATIONS, Shippers is appointing the specialised MIL Supercargo on board the vessel all the time till the completion of discharging. Shippers will be responsible for the Surveyors/Supercargo appointed by MIL

- CHARTERERS ARE TO SUPPLY MASTER/OWNERS WITH MSDS CERTIFICATE ISSUED BY THE SHIPPERS/PRODUCERS, EVIDENCING THAT CARGO IS IN STRICT CONFORMITY WITH LATEST SOLAS, IMO REGULATIONS AND IMSBC CODE.



- THE CARGO IS ALWAYS TO BE LOADED, STOWED, TRIMMED, CARRIED AND DISCHARGED IN ACCORDANCE WITH COMPETENT AUTHORITIES INCLUDING VESSELS REGISTRY, SOLAS, LOCAL AND LATEST IMSBC CODE.

- BEFORE LOADING CHARTERERS SHALL PROVIDE ALL CARGO INFORMATION REQUIRED BY THE IMSBC CODE OF SAFE PRACTICE FOR SOLID BULK CARGOES (IMSBC CODE) INCLUDING A SHIPPERS CERTIFICATE(S).

• CHRTRS/shippers is keeping an ISO tank of about 20MT Nitrogen gas and one vaporizer to inert the gas on board the vessel during the en-route to discharge port, which is more efficient than the Nitrogen bottles/pallets. Master should be responsible for the safe loading/discharging and carriage of the equipment all the time. Vessel crew will be briefed to operate the Tank and Vaporizer in case of emergency and crew should operate the same in coordination with on board supercargo MIL Surveyor.

The Nitrogen Purging system, shall be fitted in accordance to MIL Surveyors' requirements. Cost of MIL Surveyors attendance for Charterers account.

IN ADDITION, TO ALL THE ABOVE, THE CARGO CARRIAGE TO BE AS UNDER:

Carriage of cargo

a) Cargo to be loaded stowed carried and discharged in accordance with IMSBC regulations and recommendations. Master to ensure that the cargo is kept dry and properly maintained during loading and discharging and carried in accordance with IMSBC regulations, recommendations and guidelines.

b) Intended holds for loading this cargo to have natural ventilation to prevent build-up of explosive atmosphere as per advice given by Shipper's technical department(s).

Charterers will provide and place adequate piping in holds to inert the cargo and will seal holds on completion of loading at their expense under advice by Supercargo and Master's direction and supervision.

c) Owners to allow a Supercargo on board from the day the vessel commences loading and until the completion of the discharging. Owners to provide him with a cabin and 3 meals and intermediate refreshments on board free of charge. Charterers to issue L.O.I. as per Owners P. and I. Club wording with respect to boarding of Supercargo.

d) Charterers' option to have 2 qualified technicians aboard the vessel from the time of arrival at the loading port until such time as vessel ready to sail.

These technicians may accompany the vessel on her whole voyage to monitor and record and relay temperatures and hydrogen/oxygen gas contents at regular intervals not exceeding 8 hours throughout the voyage in all the holds.

The technicians are to accompany the vessel at Charterers' risk and expenses after providing Owners the standard Letter of Indemnity in Owners' P. & I. Club format.

Owners to furnish them with food and accommodation.

6



Any Charterers' or Supercargo's /Technicians' opinions/advice and comments on the safe carriage of this cargo not to relieve Master/Owners of their responsibilities and obligations in respect of the ship and the cargo.

e) Charterers' privilege to load/discharge from all hatches at any time provided weather permitting. Vessel to supply light as on board for night work if required, free of charge to Charterers. It is also understood that Officers and Crew will cooperate in every respect for a smooth operation.

f) Cargo monitoring equipment including Temp/Hydrogen/Oxygen Monitors and attending surveyors required as per IMSBC Code regulations and recommendation shall be for Shippers'/Charterers' account , free of risk and expense to vessel .

g) The ship shall carry appropriate instrumentation for measuring the concentrations of hydrogen and of oxygen in the cargo spaces. Charterers to provide same at their expense.

h) Cargo temperature, oxygen and hydrogen concentrations are to be reported at an interval of not more than eight hours throughout the voyage.

i) In the absence on board of Charterers' Supercargo/Technicians, it will be the Master who shall advise Charterers by email or fax of the daily temperature of the cargo in all holds and of the oxygen and hydrogen levels during the voyage.

j) Should the Master detect a significant abnormality in the temperature of the cargo during the voyage he will take action as a competent person for safe handling of the cargo.

k) Cargo (D.R.I. B ) to be adequately weathered and fully passivated for a minimum 72 hours prior to loading as per latest IMSBC Code regulations and any alterations to date either generally or specifically applicable to this cargo shall be recognized as such by the national administration of the country.

l) No open light, naked flame or smoking should be allowed in or near the vicinity of holds or vents containing D.R.I. B

IF MASTER/CARGO SURVEYOR (MIL)/OWNERS P & I SURVEYOR HAS DOUBT ON THE CARGO SPECIFICATIONS AND/ OR TML / MOISTURE CONTENT, A JOINT SURVEY ON THE CARGO TO BE CARRIED OUT AT SHIPPER'S LAB, WITH THE ATTENDANCE OF THE OWNERS PNI REPRESENTATIVE AND CHARTERERS / SHIPPERS REPRESENTATIVE. COST OF SURVEY TO BE EQUALLY SHARED. SHIPPERS LAB TO PERFORM THE CARGO SURVEY IN ACCORDANCE WITH THE LATEST IMSBC CODE. THE FINDING OF THE JOINT SURVEY IS FINAL AND CONCLUSIVE AND IS BINDING FOR BOTH PARTIES.



**Clause 37 – Details of the Vessel**

MV "EVOLUTION" EX "BIRCH 1"
PARTLY SEMI BOX TYPE SID/BCARRIER
(HOLD NO. 2 AND 3 SEMI BOX TYPE)
24,306 MTS DWT ON 9.733M SW TPC 34.4
BLT 1995 SAIKI JAPAN
LIBERIA FLAG, NK CLASS
PNI CLUB: THE LONDON
H&M VALUE: USD 5,040,000 MIO
INT'L GRT/NRT 14,743 / 8,289
LOA/BM 154.35M / 26M
GRAIN/BALE CAPACITIIES: 30,847.46 CBM (1,089,347.20 CBFT) /30,094.2 CBM
(1,062,746.57 CBFT)
4 HO/HA - HATCH DIMS:
NO1 19,20 X 12,72M
NO2 AND NO3 20 X 17,52M
NO4 20,80 X 17,52 M
STRENGTHS:
TANKTOP 15M2 UNIFORM
HATCHCOVER 3M2 UNIFORM
4X30T CRANES
CO2 FITTED - HOLDS 2+3 MECHANICALLY VENTILATED

| DEADWEIGHT (METRIC TONS) | DWAT | DRAFT | TPC BASIS FULL DRAFT |
|---|---|---|---|
| SUMMER | 24306 | 9.733 | 34.35 |
| WINTER | 23613 | 9.531 | 34.25 |
| TROPICAL | 25002 | 9.935 | 34.40 |
| FRESH | 24308 | 9.95 | 34.50 |
| TROPICAL FRESH | 24989 | 10.15 | 34.40 |

(ALL DETAILS ABOUT)

Owners confirm vessel is classed highest Lloyds or equivalent and is fully P and I covered by
The London P and I club and will remain so for the whole duration of this charter party.

Vessels to be non-Iranian flag/Iranian management or Iranian operators or related with
Iranian companies.

**Clause 38 – Agents**

Owners to appoint agents as nominated by charterers at loading port

Messrs Silverline Agency

Owners' agents at discharging port



**Clause 39 – Vessel's suitability and cargo details**

Once a lot is completely loaded, owners will authorize issuance of Bs/l for that respective lot

Owners to satisfy themselves about vessel's suitability for the intended ports of call and the intended cargo.

**Clause 40 – Presentation of Vessel**

Vessel to tender clear of any obstacles that might be hindering the loading and discharging of this cargo. Owners warrant that the vessel is staunch and in every way fitted for the voyage, will maintain highest class Lloyds's Register or equivalent, P&I Club membership and seaworthiness, throughout the duration of this contract, will not be sold and change ownership. The vessel will not be dry docked unless in case of emergency affecting vessels seaworthiness and that especially the gear/ventilators/ hatches/covers/coamings are in perfect working order and condition. Should Charterers surveyor detect any deficiencies regarding the ship's equipment upon commencement of the loading operations, in particular with respect to the tightness of the hatch covers, then the Master is obliged to rectify those shortcomings prior to sailing. The vessel shall furnish a certified calibration scale for all tanks, including fore and aft peaks, double bottom tanks and deep tanks, if any. Plimsoll marks amidships and draft marks both on port and starboard side to be clearly cut and marked on shell plating and Master to certify correctness of it.
Owners further warrant that the vessel is fully complying with all required regulations in the trade and all certificates/insurance necessary for safe and proper performance of this voyage are valid and on board throughout the voyage.

**Clause 41**

New Jason Clause, Both-to-Blame Collision Clause, Voywar 2004 to be incorporated into this Charter Party and Bills of Lading. Bimco ISPS Clause for voyage charter parties 2005 to be fully incorporated in this Charter Party. General Paramount Clause deemed to be incorporated into Bills of Lading. MTSA clause to apply. Owners warrant vessel is in possession of an international ship security certificate (ISSC) as per IMO's international ship and port facility security code (ISPS).

**Clause 42 – Origin of Cargo**

CHRTRS CONFIRM RECEIVERS OF BOTH PARCELS ARE FULLY AWARE OF THE ORIGIN OF THE CARGO, WHICH THEY PURCHASE, OTHERWISE ALL CLAIMS/PENALTIES MAY RISE IN THESE REGARDS TO BE FULLY FOR THE CHRTRS TIME AND ACCOUNT.

9



**Clause 43 – Force Majeure**

Time lost by reason of all or any of the following causes shall not be computed in the loading or discharging time v.i.z. war, rebellion, tumults, civil commotions, insurrections, political disturbances, epidemics, quarantine, riots, strikes, lock-outs, landslips, partial or total stoppage on rivers, canals or on railways, or any cause beyond control of charterers.

**Clause 44 – BIMCO Standard I.S.M. Clause for Voyage and Time Charter Parties**

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.
Except as otherwise provided in this Charter party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners account.
Owners warrant that the vessel is in possession of an International Ship Security Certificate (ISSC) as per IMO's International Ship and Port Facility Security Code (ISPS).
Bimco ISPS/MTSA clause for voyage charter parties 2005 to apply. Owners warrant vessel is in possession of an international ship security certificate (ISSC) as per IMO's international ship and port facility security code (ISPS).

**Clause 45 – Sanctions**

Charteres confirm that cargo/parties in connection hereof are not on the sanction list by UN/USA/EU, failing which Charterers to be held fully responsible for any cost/risks/consequences arising from vessel's carriage of the said cargo.

**Clause 46 – Confidentiality**

Terms and conditions of this Charter Party to be treated strictly confidential and are not to be disclosed to any third party.

**Clause 47 – Freight Rate and discharging port**

Freight: USD 42,00 per mton based on bill of lading weight free in and out stowed and trimmed, and holds properly protected by Charterers for DRI cargo subject to Master's/Owner's satisfaction.

10



**Clause 48 – Draft Survey**

Cargo quantity will be ascertained by draft survey both ends and vessel to have clearly readable marks and calibration tables on board.

**Clause 49 – Survey**

Shippers/Charterers have the option to appoint a surveyor on their behalf for any kind of survey/service that may be required both ends. Surveyor to be allowed to board the vessel and take photos of cargo loaded, if so required.
If Owners will arrange a P + I Club preloading survey of the cargo prior and during loading, same will be for Owners' account.

**Clause 50 – BIMCO ISPS Clause for Voyage Charter Parties**

    (i)      From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owners shall procure that both the Vessel and

    (ii)    "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security

(a) Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other information the Owners require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(b) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall apply:

11



(i)Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii)Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterers at the demurrage rate. Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(i)If either party makes any payment which is for the other party's account according to this

** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** **

12

# EXHIBIT 5

CODE NAME: "CONGENBILL" EDITION 1994

Page 2

Shipper

**INTERFER STEEL AND COMMODITIES FZE
OFFICE NO. G-018 LOB 21 / P.O. BOX 16896
JEBEL ALI, DUBAI
UNITED ARAB EMIRATES**

**BILL OF LADING**
TO BE USED WITH CHARTER-PARTIES

B/L No. 001

Consignee
**TO ORDER**

# ORIGINAL

Notify address
**PT. ISPAT INDO
DESA KEDUNGTURI, TAMAN,
SIDOARJO, 61257
JAWA TIMUR, INDONESIA**

Vessel
**MV EVOLUTION**

Port of loading
**JEBEL ALI, DUBAI, UAE**

Port of discharge
**SURABAYA PORT, INDONESIA**

Shipper's description of goods

Gross weight

**DIRECT REDUCED IRON (DRI) TYPE B
CONTRACT NO: 5121-00250**

**TOTAL QUANTITY:
15,095.648 METRIC TON**

**FREIGHT PREPAID**

**SHIPPED ON BOARD (28.06.2018)**

(of which — on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

Freight payable as per
CHARTER-PARTY dated 05ᵗʰ May 2018

FREIGHT ADVANCE.
Received on account of freight:

.................................................................................

Time used for loading ....................... days ...................... hours

REMARKS / CLAUSES:

SHIPPED at the Port of Loading in apparent good order and
condition on board the Vessel for carriage to the Port of Discharge or so
near thereto as she may safely get the goods specified above.

Weight, measure, quality, quantity, condition, contents and value
unknown.

IN WITNESS whereof the Master or Agent of the said Vessel has
signed the number of Bills of Lading indicated below all of this tenor and
date, any one of which being accomplished the others shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

Freight payable at
**FREIGHT PREPAID**

Place and date of issue
**JEBEL ALI, DUBAI, UAE 28.06.2018**

Number of original Bs/L
**3 / THREE**

Signature
**COMCHART HAMBURG GMBH
AS AGENT FOR AND ON
BEHALF OF THE MASTER OF
MV EVOLUTION
CAPT. LOUDIS ARIS**

**BILL OF LADING**
TO BE USED WITH CHARTER-PARTIES
CODE NAME: "CONGEN BILL"
EDITION 1994
ADOPTED BY
THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)

# Conditions of Carriage

(1) All terms and conditions, liberties and exceptions of the Contract, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated.

(2) General Paramount Clause.
  (a) The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this Bill of Lading. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.
  (b) Trades where *Hague-Visby Rules* apply.
    In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 - the Hague Visby Rules - apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.
  (c) The Carrier shall in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier, nor in respect of deck cargo or live animals.

(3) General Average.
General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof, in London unless another place is agreed in the Charter Party.
Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part 11, Art. 148.

(4) New Jason Clause.
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier, or his agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Carrier before delivery.

(5) Both-to-Blame Collision Clause.
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier.
The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

For particulars of cargo, freight, destination, etc., see overleaf.

Interfer-Steel and
Commodities FZE
G018, LOB-21
P.O. Box: 16896
Jebel Ali Free Zone
Dubai - UAE

# EXHIBIT 6



# BOYD MARINE
## C O N S U L T A N T S

Wisma PMI 6th Floor
Jl. Wijaya 1 No. 63, Kebayoran Baru
Jakarta Selatan - Indonesia 12170
Tel: +62 21 275 15873
Fax: +62 21 27515873
Email: surveys@bmcindonesia.co.id

| | |
|---|---|
| Date | : 15th August 2018 |
| To | : SPICA Services (Indonesia) |
| Y.ref | : LLP/11/18/MA |
| | |
| From | : Boyd Marine Consultants |
| O.ref | : 114/18/SBY/GJH |
| Vessel's Name | : **MV. "EVOLUTION"** |
| Kind of Survey | : Damage Survey & Investigation |
| Location | : Jetty west wharf of Jamrud – Tanjung Perak, Surabaya |
| Date of Survey | : On 19th – 22nd July 2018 |
| Subject | : High temperature cargo DRI and Protest letter |

## **FINAL REPORT**

In compliance with the email instruction dated 18th July 2018 from SPICA Services (Indonesia), representing the London P&I Club and acting on behalf of owners of vessel named "EVOLUTION". The undersigned surveyor did attend on board mentioned vessel whilst she was berthing at West Wharf of Jamrud – Tanjung Perak, Surabaya.

The purpose of our attendance was to conduct survey on damage cargo due to self-heating with high temperature and as well to investigate the cause of self-heating cargo and extent to damages which allegedly affected to vessel.

We would report our findings as follows: -



## 1.0    GENERAL INFORMATION

1.1    Upon received your instruction on 18th July 2018 at 15.30 LT, further we contacted to Mr. John as PIC agent of PT. BTJ Lines (Bahari Tirta Jaya Lines) who advised that local agent representative at Surabaya is Mr. Heru for smooth survey arrangement to the vessel. Accordingly, liaised to Mr. Heru and informed that subject vessel was currently berthed and still in progress discharged her cargo at West wharf Jamrud, Port of Tanjung Perak, Surabaya – Indonesia and estimate to complete discharge on 19th July 2018 at around evening time.

1.2    As per shipping instruction received by that the cargo DRI (Direct Reduced Iron) was loaded at Bandar Abbas – Iran. She was departed from the loading port on 28th June 2018 and arrived at anchorage nearby the Port of discharge – Surabaya, on 17th July 2018.

1.3    As reportedly that on 18th July 2018 at 01.00 LT, the commenced discharge cargo followed by vessel cranes. It was stated by the Chief officer, attending supercargo (shipper on behalf) and foreman stevedore – Pelindo Surabaya that prior opening all cargo hatches hatch ventilations, cargo manholes are installed with sealing foam and Ramnek Marine Tape was found intact as observed.

1.4    As per documents received from Master that the consignee was issued the letter of protest to the vessel because the self-heating/overheating cargo at no.2 hold was found during progressed cargo discharge at subject vessel.

1.5    On 19th July 2018 at 06.45 LT, we safely landed and arrived at Surabaya and directly dispatched to Port of Tanjung Perak by transportation / rent car. At 08.35 LT, embarked the subject vessel and guided by duty officer to the ship office to meet the Master of vessel.

1.6    Accordingly, we met the Master and introduced our purpose attendant on board the vessel. The master provided us with the relevant documents and information subject to incident of cargo. Upon shortly briefed with



Chief officer and Master directly carried out inspection on board to the cargo loaded at no.1,2,3 and 4 cargo holds. As observed due to arrived and embarked on board the vessel still in progressed discharge the remaining cargo as about 3,089.21 metric ton as recorded by vessel and terminal of Jamrud wharf.

1.7    Upon our arrival on board, we have met with the representatives from consignee / receiver, super cargo who was attended on board since the loading began at the port of load).

1.8    From 11.30 – 13.30 LT, we conducted minutes of meeting with concerned parties in order to discussed methods of discharge for the remaining cargo "DRI" at no.2 hold which found with high temperatures about 300 degrees centigrade. (attached minutes of meeting conclude).

1.9    Upon completed discharge cargo at no. 1,3 and 4 hold last night, subsequently from 21.15 - 23.00 LT, the final draft survey was conducted by Chief Officer, two surveyors Sucofindo on behalf Shipper and receiver.

1.10   On 20th July 2018 at 00.10 LT, commenced introduced fresh water into the cargo hold no.2 to extinguished overheating and burning cargo "DRI" by using the fire fighters' personnel and mobile unit. At 21.40 LT, commenced discharge at no.2 cargo hold upon completion poured fresh water at mentioned hold.

1.11   On 21st July 2018 at 04.00 LT, the discharged operation was halted. At 16.10 LT, resumed discharging at no.2 cargo hold followed by shore cranes and excavator.

1.12   On the 22nd July 2018 at 03.55 LT, the discharge operation at subject vessel was accomplished. At 09.20 LT, the subject vessel was departed from Surabaya Port and proceed to the next port of loading as instructed.

1.13   On the 23rd July 2018 at 17.00 LT, the surveyor left Surabaya and proceeded back to Jakarta base.



**2.0    SCHEDULE**

| | |
|---|---|
| Vessel arrived and berthed | : on 17th July 2018 at 23.30 LT |
| Commenced discharge for all holds | : on 18th July 2018 at 01.00 LT |
| Incident occurred | : on 18th July 2018 at 08.00 LT |
| Instruction received | : on 18th July 2018 at 15.30 LT |
| Surveyor onboard | : on 19th July 2018 at 08.30 LT |
| Inspection on board in progress | : on 19th July 2018 at 09.30 LT |
| Minutes of meeting with parties' concern | : on 19th July 2018 at 11.30 LT |
| Completed discharged at no.1,3,4 holds | : on 19th July 2018 at 21.15 LT |
| Commenced flooding water into no.2 hold | : on 20th July 2018 at 00.10 LT |
| Completed flooding water into no.2 hold | : on 20th July 2018 at 21.00 LT |
| Commenced discharge cargo at no.2 hold | : on 21st July 2018 at 00.10 LT |
| Discharged cargo at no.2 hold was halted | : on 21st July 2018 at 04.00 LT |
| Resumed discharging at no.2 cargo hold | : on 21st July 2018 at 16.10 LT |
| Accomplished discharge at no.2 cargo hold | : on 22nd July 2018 at 03.55 LT |
| Surveyor disembarked from the vessel | : on 22nd July 2018 at 08.00 LT |
| Vessel departed from Port of Surabaya | : on 23rd July 2018 at 09.20 LT |

**3.0    PRESENT AT THE SURVEY**                                    **: REPRESENTING**

| | |
|---|---|
| Capt. Tsoudis Aris, Master of MV. EVOLUTION | : Member |
| Mr. Santillan Joel Turbador, Chief Officer | : Member |
| Mr. Cabral Carlos Dela Cruz, Second Officer | : Member |



| | |
|---|---|
| Mr. Heru, Bahari Tirta Jaya Lines | : Local agent |
| Mr. Radja and Anil, PT. ISPAT INDO - Surabaya | : Consignee |
| Mr. Ewe Hye Keat, Super cargo | : Shippers |
| Mr. Deny, Foreman Pelindo III – Surabaya | : Stevedoring |
| Mr. Siswo, PT. Sucofindo – Surveyor | : Shippers |
| Mr. Sujih, PT. Sucofindo – Surveyor | : Buyers |
| Mr. Gabriel J Haning, Surveyor of BMC Indonesia | : Members P&I |

## 4.0    VESSEL PARTICULARS

| | |
|---|---|
| Name of the vessel | **: MV. EVOLUTION** |
| Call Sign | : D5HM9 |
| Type of ship | : Cargo ship |
| Port of registry | : Monrovia/ Liberia |
| MMSI number | : 636016732 |
| IMO No. | : 9122899 |
| Official No. | : 16732 |
| Owners | : Smooth Navigation LTD – Marshall Island |
| Operator | : Beta Marine Corporation |
| Built by | : Saiki Heavy Industries Co. Ltd Japan |
| Hull No. | : S - 595 |
| Date Keel Laid | : 04 Aug 1995 |
| Delivered | : 27 Nov 1995 |



| | |
|---|---|
| Light ship | : 5,520 Metric ton |
| Class reg | : NKK |
| Deadweight | : 24306.38 Metric ton |
| LOA/LBP | : 154.35 m/146.00 m |
| Breadth Moulded | : 26.00 m |
| Summer Draft | : 9.733 m |
| Depth | : 13.35 m |
| GRT/NRT | : 14743 MT / 8289 MT |
| Service speed | : 12.00 Knots |
| Main Engine | : Man – B&W 7s35 CSO (5985 HP X 164 Rpm) |

**5.0     THE SURVEY**

The following sequences of events are based on inspection and information provided by the crew members including the undersigned findings based on documents which made available at the time of our survey: -

5.1     The vessel berthed at West Jamrud wharf, Surabaya on 17th July 2018 at 23.30 LT. Further the discharge operation was commenced on the 18th July 2018 at 01.50 LT.

5.2     The vessel was loaded with cargo DRI (B) about 15,095.648 MT from Bandar Abbas, Iran. The ship departed from loading port on 28th June 2018.

5.3     During loading process, the super cargo namely Mr. Ewe Hye Keat of MIL surveyor who appointed by shipper. He also on board the vessel throughout vessel sailing from loading port till the vessel arrived in Surabaya on the 17th July 2018 at 23.30 LT. Throughout the passage,



shipper surveyor carried out daily monitoring of the cargo temperature of all holds and found the maximum temperature around 43 Deg Centigrade.

5.4    The surveyor (Shippers) took temperature from booby hatch of each hold, where the shipper surveyor already put several temperature sensors inside the hold and he just connect to each point for daily measurement.

5.5    There are 5 temperature sensors installed in the bottom of the cargo (tank top surface) and 4 sensors installed on top of the cargo surface. In addition, the Nitrogen spare tank provided on board by shippers during the passage. However, since the temperature found with acceptable limit, the Nitrogen supply was never carried out. The Nitrogen gas pipe has been damaged during discharging process.

5.6    During opening of the hold no.2, the consignee reps stated that he has observed smoke came out from hold no.2 and subsequently issued letter of protest and followed by the 2nd letter of protest for cargo condition in No.2 hold that considered at damaged cargo.

5.7    On the 19th July 2018 at 08.35 LT, we embarked the subject vessel and further conducted our task as instructed by members. As observed, at the time we embarked on board the vessel, the discharge still in progress to the remaining cargo at all holds were about 3,089.21 metric ton as recorded by vessel and terminal of Jamrud Wharf - Surabaya. While the cargo remaining in hold no.2 is about 700 metric tons.

5.8    From 11.30 – 13.30 LT, we conducted minutes of meeting with parties' concern to discussed kind of methods to discharged for the remaining cargo "DRI" at no.2 hold which found with high temperatures about 300 degrees centigrade. The result of minutes of meeting are: -

➢    In order to save the vessel structures and cooling down the cargo for safe discharge operation. The party concerns who attends on board were agreed that the cargo at no.2 hold to be pouring with water methods, such as flooding the cargo until top of cargo surface.



> ➤ The water flooding methods shall be taken place after completion of cargo discharge from remaining holds (1,3,4) and the draft survey will be carried out to obtain quantity.

> ➤ As stated by receiver reps that the cargo at no.2 hold considered was damage and once completion flooding methods, the cargo was unusable and therefore will be rejected. The cargo will be stored in the scrap yard.

5.9    At 21.00 LT, the cargo discharged operation at hold no. 1,3,4 completed, except the cargo at hold no.2 as observed.

5.10    The result of the total cargo has been discharged at no.1, 3, and 4 cargo hold as per final draft survey, approx. 14,382.903 MT. Meanwhile, as per shipping instructions the total cargo to be discharge approx. 15,095.648 MT, which the remaining cargo in hold no.2 about 712,745 MT.

5.11    On 20th July 2018 at 00.10 LT, introduced fresh water into the cargo hold no.2 for extinguished overheating and burning cargo "DRI" used by the fire fighters' personnel and mobile unit. All preparation was arranged by local agent and about 15 tons of fresh water has been utilized until this morning. The sea water was also used to add some more water in order to flood the hold until top of cargo surface.

5.12    The flooding of cargo hold no. 2 has completed around 1800 LT and will await the cargo temperature to settle down. The cargo was observed completely submerged.

5.13    The discharge of cargo from hold no. 2 was commenced at 2140 LT. However, as observed the discharge rate was very slow due to the grab mostly catch up water and small amount of cargo due to the water level in hold is about 2 meters high.

5.14    We have discussed with Master, how to reduce the amount of water from hold no.2 and advised master to transfer the water to hold no. 1 and 3 either by used Bilge pump or used Portable pump or combination. Another option is to discharge the water overboard as it considered as ballast



water. Despite all, the Master will take best option and once the water at no.2 cargo hold within reach of excavator, then discharge will be resumed.

5.15    As observed there are some cargo ex-hold no.2 that currently still on the wharf. These cargoes are being poured with water to cool it down.

5.16    On 21st July 2018 at 04.00 LT, the cargo discharging operation at no.2 hold was stopped due to the shore grabs cannot reach the remaining cargo stuck on the sides of cargo hold. As informed by foreman stevedore that they really need the excavator to assist the grab at no.2 hold. Unfortunately, the excavator may not transfer into the cargo hold no.2 due to the depth of water flooded at subject hold about 1 meter remain. Meanwhile the shore scale figures cargo has discharged since last night about 150 metric tons.

5.17    The vessel has informed the receiver or party concerned if they could arrange the high-power pump portable from ashore to provide at vessel regarding pump out the water flooded into the TST no. 2 PS/STB. At this point, the local agent and party concerned shall be take decision and solved the issue as soon as possible.

5.18    Refer to pump out the water flooded issue. As discussed with master regarding transfer of the water from hold no.2. The solution methods to pump out water flooded are: -

   ❖    The water in hold no. 2 has been transferred into the TST port side tank via manhole by means of listing the vessel to port. However, due to the manhole was fully covered by cargo Ramnek Marine Tape. Henceforth at 11.35 LT, the vessel decided to be listing the vessel till 5 degrees to the starboard side to remove the flooded water and cargo which blocked the manhole of PS TST.

   ❖    At 13.45 LT, the Manhole PS TST was freed from the water flooded and the cargo cover manhole subsequently was opened by vessel crew. Upon the cover of manhole PS TST opened, the vessel then listed again to port and let the water flow into TST tank by gravity.



Meanwhile the routine sounding was maintained throughout the transfer process.

5.19   At 15.45 LT, the stevedores prepared the shovels and excavator to be transferred into the cargo hold no.2. As per observed the depth of water flooded was decrease approx. 1,30 meters. At 16.10 LT, the equipment and excavator successfully transferred into the hold no.2 and started to collect the cargo and well as discharged the cargo at the same time. The cargo discharging was temporarily stopped at 18.00 LT, due to break/meal time.

5.20   At 19.15 LT, the resumed discharged at no.2 cargo hold used shore crane/grab.

5.21   On 22nd July 2018, discharge cargo operation was completed at 03.30 LT. All the cargo on board completely discharged and all cargo on wharf also completely transferred to consignee's warehouse facility (Scrap Yard) which is separated from sound cargo.

5.22   The vessel subsequently departed from port at 09.20 LT and until the vessel departure, there was no official claim received from the consignee regarding the damaged cargo.

## 6.0   CAUSE AND EXTEND DAMAGE TO CARGO

Based on our inspection and investigation to the self-heating and burning cargo at no.2 hold. The caused and sustained cargo burnt are as follows: -

➢   Refers to inspection to the cargo burnt, the cargoes were found overheat due to less cooling oxygen to be consume by cargo DRI at no.2 cargo hold, which made self-heating occurred at the bottom part of cargo.

➢   The slightly coated paint to sides hull – internal part and several stained was burnt on the bottom part of cargo hold no.2 as observed.

➢   The appearance cargo burnt was colored with slight rust stained and cracked.



> ➤ No other damage occurred to other cargo holds above.

### 7.0   PHOTOGRAPHS

**Photos prior loading provided by supercargo**

**Pipe lines for installation Nitrogen and ramneck tape**

 

MV. Evolution whilst berthed at Bandar Abbas – Iran and hold condition

 

Side shells plate of cargo holds

 

Tank top cargo holds as generally viewed and condition of bulkhead



 

The condition bilge at holds found dry and clean, The bilge covered using Ramnek tape

 

The $CO_2$ bottle installation found in good condition, still valid

 

The main bilge found in sealed as observe



 

Hatch cover tightness test using Ultrasonic (USHCT) prior to loading Conducted by super cargo of shipper

 

Pipes and welding equipment's on board transferred to vessel at anchorage

 

Installing / fixing pipe line for Nitrogen purging purpose



 

Installing / fixing pipe line for Nitrogen purging purpose

 

Holes of daughter pipes are facing downwards – pipe on deck

 

Overall view of pipe in hold. Labelling and positioning of TC's





Labeling and positioning of the TC's as well as the thermocouple wires were numbered



Photographs during loading operation



Air temperature monitored before loading

Page 15 of 26






Loading in progress using bucket




Applying Ram-nek Tape in progress.




The condition of hatch cover sealed and purging of cargo



 

Purging in progress supplied from truck

 

The installation additional pipes for purging and measuring temperature of cargo

 

View of installment valves nitrogen and line connection to Nitrogen tank on board




The spare compressor nitrogen stored at main deck forward starboard side




Cargo loaded in no.1 hold




Cargo loaded in no.2 hold



 

Cargo loaded in no.3 hold

 

Cargo loaded in no.4 hold

**Photographs of discharging cargo DRI at West Jamrud - Surabaya (Indonesia)**

 

MV. EVOLUTION whilst berthed at West Jamrud – Port of Surabaya



 

The observation at no.1 hold

 

View of observation at no.3 hold

 

View of observation in no.4 hold





Condition of cargo in hold no. 2 – the cargo found burnt



All parties observed cargo condition in hold no. 2 – highest temperature shows 392 °C



The fire brigade prepared to extinguished burning cargo at no.2 hold



 

View of condition cargo burnt during added freshwater in no.2 hold and on wharf

 

The cargo ex – hold no.2 on wharf found no burnt and smoke as observed

 

The cargo in hold no. 2 has been completely submerged.
The process of discharging using ship's grab



 

The infra-red pointer thermometer and Gas Detector used by supercargo
The equipment is properly calibrated

 

View of cargo hold no.2 upon completion flooded the cargo with water

 

The manhole TST at portside was observed upon listed the vessel
(see the yellow arrow)



 

Seems the flooding no.2 hold decreased upon removing the water into TST tank

 

The operation to remove remaining burnt to be transfer into the flood water

 

The shore grab was taking wet cargo DRI with well no water attach





The stevedores were collecting the cargo stuck on the shell plating edge

Collecting cargo into the center of hold for smooth taken by grab



The cargo hatches in closed and operation discharge was completed
(no remaining cargo and the spare tank have been disconnected from vessel)

### 8.0    SURVEYOR'S NOTES

Based on foregoing information and our investigation due to incident happened we would like to provide the following comments:-

8.1    The appearance of cargo condition at no.2 hold was caused by self-heating, indicated that the reported damage cargo was happened recently.

8.2    Refers to temperature recorded which provided by supercargo during the vessel voyage from the port of load to port of discharge, the temperature readings stated in daily measure were found below $65^{0}C$ and considered to be accepted to load as per subject to IMSBC code.



8.3    Based on that record temperature and investigation we are of opinion without prejudice that the cause of incident to cargo DRI at no.2 hold, may occurred due to the cargo was contained with self-heating due to highest temperature as sensor cable installed in addition of pipes for purging was damaged during the voyage to Surabaya. Henceforth the reading of temperatures which conducted in daily on board by surveyor of shipper may not accurate or inaccurate.

8.4    We have checked with cargo receiver reps and verbally stated that the cargo is unusable and therefore will be rejected. The cargo will be stored in the scrap yard.

8.5    As observed until the vessel departure from the site, there is no claim, or any issue arise from consignee regarding the cargo damaged.

*(This report is for the information only of the company's solicitors prepared for the purpose of obtaining professional advice in proceedings pending, threatened or anticipated.)*

**BOYD MARINE CONSULTANTS**

**GABRIEL J. H**

(attending surveyor)

# EXHIBIT 7



## COMMERCIAL INVOICE NO: CGTME-JB-636/18

*Dated: 28.06.2018*

| Buyer | Beneficiary/Shipper |
|---|---|
| **Interfer – Steel and Commodities FZE**<br>Jebel Ali, Dubai | **CGT Middle East LLC**<br>P.O.Box. 476403, Dubai, U.A.E.<br>Tel.04-4422050,<br>Fax No. 04 4422057 |

### Description of Goods

**Direct Reduced Iron for Indonesia**

| Terms | Net Weight (MT) | Unit Price (AED/MT) | Total Amount (AED) |
|---|---|---|---|
| **Total Amount FOB** | 15,095.648 | 1,046.24 | 15,793,670.76 |
| **Total Receivable** | | | 15,793,670.76 |

**Bank Details:**

| | | |
|---|---|---|
| Account Name | : | CGT MIDDLE EAST LLC |
| Bank Name | : | COMMERCIAL BANK INTERNATIONAL |
| Bank address | : | Dubai Main Branch |
| Account No. (AED) | : | 100011472239 |
| IBAN No. | : | AE920220000100011472239 |
| Swift Code | : | CLBIAEAD |

Yours truly,

**CGT MIDDLE EAST LLC**



T | + 971 4 3323664
F | +971 4 3323448
A | Office No. 3001, Marina Plaza,
Dubai Marina, Dubai, U.A.E.
P.O Box: 41985
E | info@cgtme.ae
W | www.cgtme.ae

# EXHIBIT 8


**IF INTERFER**
STEEL AND COMMODITIES

PT. ISPAT INDO
DESA KEDUNGTURI, TAMAN,
SIDOARJO, 61257
JAWA TIMUR
INDONESIA

**Original**

## COMMERCIAL INVOICE NO. 5124-00329

dated 28.06.2018

We deliver by MV EVOLUTION the following:

NAME OF PRODUCT:     DIRECT REDUCED IRON (DRI) TYPE B
QUANTITY:                     15,095.648
UNIT PRICE:                   SGD 441.54
DISCHARGE PORT:        SURABAYA PORT, INDONESIA
VESSEL NAME:             MV EVOLUTION

DELIVERY TERMS: CIF FO SURABAYA PORT, INDONESIA

TOTAL INVOICE VALUE: SGD 6,665,332.42

MINUS ADVANCE PAYMENT: 332,392.50

**Total payable Amount: SGD 6,332,939.92**
Payable at sight

**PAYMENT TERM:** payable amount received at Seller's account latest 2 (three) days after receipt of copy of Bill of Lading
and invoice by email. Original documents to be surrendered only after receipt of full amount on Seller's account.

**Please remit Invoice amount to the following bank account:**

Beneficiary:          Interfer-Steel and Commodities FZE
Bank:                   Deutsche Bank AG
Bank Branch:        66070004
Account:              0532424 00
IBAN:                   DE05 6607 0004 0053 2424 00
BIC/SWIFT:           DEUTDESM660

## INTERFER-STEEL AND COMMODITIES FZE

Interfer-Steel and
Commodities FZE
G018, LOB-21
P.O.Box: 16896
Jebel Ali Free Zone
Dubai - UAE

Interfer - Steel and Commodities FZE • Office No. G-018 LOB 21 • P.O.Box 16896 • Jebel Ali • Dubai • United Arab Emirates
License No.: 128365 • Registration No.: 147633